ROB BONTA
Attorney General of California
JENNIFER G. PERKELL, SBN 203205
Supervising Deputy Attorney General
JENNIFER A. BUNSHOFT, SBN 197306
JENNIFER C. ADDAMS, SBN 209355
JOSÉ PABLO GALÁN DE LA CRUZ, SBN 339970
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3377
  Fax:  (415) 703-1107
  E-mail:  Jennifer.Bunshoft@doj.ca.gov
*Attorneys for Defendant Dr. Erica Pan, in her
official capacity as Director of the California
Department of Public Health*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **ERICA JIMENEZ, individually and on behalf of a class of similarly situated individuals,**<br><br>Plaintiff,<br><br>v.<br><br>**DR. ERICA PAN, in her official capacity as Director of the California Department of Public Health; DR. BARBARA FERRER, in her official capacity as Director of the Los Angeles County Department of Public Health; MANUEL CARMONA, in his official capacity as the Director of Public Health for the Pasadena Public Health Department; LOS ANGELES COUNTY DEPARTMENT OF PUBLIC HEALTH; and PASADENA PUBLIC HEALTH DEPARTMENT,**<br><br>Defendants. | 2:26-cv-03500-SPG-SP<br><br>**DEFENDANT DIRECTOR OF THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH ERICA PAN'S CORRECTED OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:            May 27, 2026<br>Time:            1:30 p.m._<br>Courtroom:   5C<br>Judge:           The Honorable Sherilyn Peace Garnett<br><br>Trial Date:<br>Action Filed: 4/02/2026 |

# TABLE OF CONTENTS

Page

Introduction.................................................................................................6

Factual and Procedural Background...........................................................7

    I.    Plaintiff's Allegations and Relevant Facts.....................................7

    II.    CDPH Implements Statewide Programs to Ensure that California's Mothers and Infants Receive Quality Health Care..........8

        A.    CDPH's Assessments of the Health of Californians .................8

            1.    Data Sources that Support CDPH's Programs.................8

            2.    The Maternal, Child & Adolescent Health Division (MCAH) .........................................................................9

            3.    MCAH Mission and Programming .................................9

        B.    The Black Infant Health Program...........................................10

            1.    History of the Program...................................................10

            2.    Statistical Data that Supports the BIH Program.............11

            3.    Governing Concepts of the BIH Program......................12

            4.    Impact of the BIH Program............................................12

            5.    Participation in the BIH Program...................................13

        C.    Culturally Specific Interventions............................................13

        D.    Comparable Programs and Resources Through the State and LHJs ...............................................................................13

Applicable Legal Standard .......................................................................14

Argument ..................................................................................................15

    I.    At the Threshold, Plaintiff Lacks Standing to Seek Preliminary Injunctive Relief.........................................................15

    II.    Plaintiff Is Not Likely to Succeed on the Merits of Her Equal Protection or Title VI Claims.........................................................18

        A.    Plaintiff Is Not Likely to Prevail on the Merits of Her Equal Protection Claim..........................................................19

            1.    Strict Scrutiny Does Not Apply Here Because CDPH Does Not Have a Policy of Prohibiting People from Enrolling in the BIH Program Based on Race. ...............................................................19

            2.    The BIH Survives Strict Scrutiny Because It Is Narrowly Tailored to a Compelling Governmental Interest. ..........................................................................21

i

**TABLE OF CONTENTS**
**(continued)**

Page

       a.   The BIH Program Serves the State's Compelling Interest in Supporting Maternal Health and Reducing the Disproportionately High Infant and Maternal Mortality Rate in the Black Community. ...........................................21

       b.   The BIH Program Is Narrowly Tailored to Serve the State's Compelling Public Health Interest...........................................25

   B.   Because the BIH Program Does Not Impose a Racial Classification that Violates the Equal Protection Clause, Plaintiff's Title VI Claim Is Not Likely to Succeed on the Merits. ...........................................27

III.   Plaintiff Fails to Show that She Faces Likely Irreparable Harm Due to Her Alleged Exclusion from the BIH Program.......................28

IV.   Because the BIH Program Promotes the Health and Safety of Black Mothers and Infants, the Public Interest Weighs Against Jimenez's Requested Preliminary Injunction ...................................29

Conclusion ...........................................................................................30

Certificate of Compliance .....................................................................32

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Adarand Constructors, Inc. v. Pena*
515 U.S. 200 (1995) ..................................................................21

*Al Otro Lado v. Wolf*
952 F.3d 999 (9th Cir. 2020) ...................................................18, 29

*American Encore v. Fontes*
152 F.4th 1097 (9th Cir. 2025)...................................................15

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*
950 F.2d 1401 (9th Cir. 1991)....................................................16

*Buchwald v. University of New Mexico School of Medicine*
159 F.3d 487 (9th Cir. 1998)......................................................21

*California Trucking Association v. Bonta*
996 F.3d 644 (9th Cir. 2021)......................................................15

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ..................................................................16

*Ctr. for Food Safety v. Vilsack*
636 F.3d 1166 (9th Cir. 2011)...................................................28, 29

*Doe v. San Diego Unified Sch. Dist.*
(9th Cir. 2021) 19 F.4th 1173 (9th Cir. 2021)................................29, 30

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014)....................................................15

*Food & Drug Admin. v. All. for Hippocratic Med.*
602 U.S. 367 (2024) ..................................................................16

*Garcia v. Google, Inc.*
786 F.3d 733 (9th Cir. 2015) .....................................................15

*Globe Newspaper Co. v. Superior Ct. for Norfolk County*
457 U.S. 596 (1982) ..................................................................22

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Grutter v. Bollinger*
539 U.S. 306 (2003) ...................................................................26

*Hunter v. Regents of University of California*
190 F.3d 1061 (9th Cir. 1999).............................................*passim*

*Jacobson v. Massachusetts*
197 U.S. 11 (1905) ....................................................................22

*Klein v. San Clemente*
584 F.3d 1196 (9th Cir. 2009) ...................................................15

*Louisiana v. Callais*
2026 WL 1153054 .....................................................................24

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) ..................................................................16

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*
571 F.3d 873 (9th Cir. 2009)......................................................15

*McLean v. Crabtree*
173 F.3d 1176 (9th Cir. 1999).....................................................19

*Mitchell v. Washington*
818 F.3d 436 (9th Cir. 2016) ......................................................22

*Orantes-Hernandez v. Thornburg*
919 F.2d 549 (9th Cir. 1990).......................................................15

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*
551 U.S. 701 (2007) ..................................................................20

*Payan v. Los Angeles Cmty. Coll. Dist.*
11 F.4th 729 (9th Cir. 2021).......................................................28

*Regents of the Univ. of Cal. v. Bakke*
438 U.S. 265 (1978) ..................................................................22

*Roman Cath. Diocese of Brooklyn v. Cuomo*
592 U.S. 14 (2020) ....................................................................22

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Second City Music Inc. v. City of Chicago, Ill.*
   333 F.3d 846 (7th Cir. 2003) ...................................................................................29

*Steel Co. v. Citizens for a Better Env't*
   523 U.S. 83, 102 (1998) ..........................................................................................16

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*
   600 U.S. 181 (2023) ...........................................................................................20, 27

*Western States Paving Co., Inc. v. Washington State Dept. of Transp.*
   407 F.3d 983 (9th Cir. 2005).....................................................................................27

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .............................................................................................14, 15

**STATUTES**

42 U.S.C.
   § 701(a)(1)(A), (B), (D)........................................................................................8, 22
   § 2000d .......................................................................................................................28

California Health and Safety Code
   § 123259(a).................................................................................................................23
   § 131000 *et seq.* ...........................................................................................................8

**CONSTITUTIONAL PROVISIONS**

Fifth Amendment...............................................................................................................28

**OTHER AUTHORITIES**

Senate Bill 65 .....................................................................................................................9

Senate Bill 165...................................................................................................................10

**INTRODUCTION**

Plaintiff, Erica Jimenez, challenges as discriminatory on the basis of race the State's Black Infant Health (BIH) program, which is designed to address the public health crisis of significantly higher mortality rates of Black and African American mothers and their infants as compared to other demographics.

As a threshold matter, Plaintiff cannot establish that she has standing to seek a preliminary injunction because the record does not demonstrate that she actually sought admission to and was rejected from the BIH program, or that she would necessarily be denied participation in the program if she were to take the required steps to apply. For at least this reason, Plaintiff's preliminary injunction motion should be denied, and there is no need for the Court to address the substantive merits.

Even if Plaintiff were able to establish standing, the record does not support an equal protection claim because the California Department of Public Health (CDPH or the Department) does not have a policy of prohibiting otherwise qualified applicants from enrolling in the BIH program if they do not self-identify as Black or African American. While the program is designed to address an important public-health need of Black and African American women and infants, it does not discriminate based on race because participation is not limited to Black and African American applicants. Thus, strict scrutiny does not apply, and Plaintiff is not likely to succeed on the merits of her equal protection claim.

If the Court nevertheless disagrees that the program does not exclude participants based on their race, the BIH program survives strict scrutiny because the evidence amply demonstrates that it is narrowly tailored to advance the State's compelling interest in addressing the high infant and maternal mortality rates disproportionately impacting the Black community.

Finally, because Plaintiff has failed to establish imminent harm, the public interest weighs heavily against the issuance of a preliminary injunction, and in

6

favor of maintaining the status quo. Accordingly, the requested preliminary injunction should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  PLAINTIFF'S ALLEGATIONS AND RELEVANT FACTS

According to her complaint, Plaintiff Erika Jimenez is a new mother who resides in Pasadena, California. ECF 1 (Complaint, ¶ 26). In March 2026, Jimenez gave birth to her first child. *Id.*, ¶ 27. Plaintiff does not identify as Black, nor does she identify her infant as Black. *Id.*, ¶ 28.

Before giving birth, Plaintiff completed the City of Pasadena's online interest form for the BIH program. ECF 1 (Complaint, ¶ 29). Plaintiff alleges that on February 27, 2026, she spoke with a City of Pasadena BIH coordinator who explained to her that she did not qualify for the BIH program and referred her to other resources. Jimenez Decl., ¶ 4. Yet, this bare allegation is belied by the testimony of the BIH representative who received the call from Ms. Jimenez. According to Ms. Scott's testimony, Plaintiff did not seek admission to the program, did not disclose her race during her call with the BIH coordinator, and was not denied, or told she had been denied, admission to the program. Decl. of McKenzie Scott, ¶ 9. Plaintiff was further advised of numerous other programmatic options that she could avail herself of in addition to BIH, consistent with the City's practice of providing such information to anyone seeking pregnancy/parenting support. *Id.*, ¶¶ 6–8. Yet, there is no evidence that Plaintiff has chosen to pursue any of these alternative resources. *Id.*, ¶ 12. Finally, the evidence establishes that CDPH does not deny admission to the program on the basis of race to potential, otherwise eligible applicants. Declaration of Rita Nguyen, M.D., in Support of Opposition to Preliminary Injunction (Nguyen Decl.), ¶¶ 45–52.

By this action, Plaintiff alleges a violation of the Equal Protection Clause and Title VI of the 1964 Civil Rights Act based on her alleged exclusion from the BIH

program.  By her motion for preliminary injunction, Plaintiff seeks an order that would permit her to participate in the BIH program before she reaches six months postpartum and is ineligible for services.  ECF 13-6 (Mot. at 19:25-27).

## II.  CDPH IMPLEMENTS STATEWIDE PROGRAMS TO ENSURE THAT CALIFORNIA'S MOTHERS AND INFANTS RECEIVE QUALITY HEALTH CARE

### A.  CDPH's Assessments of the Health of Californians

CDPH is tasked with protecting and promoting the health of Californians through population-based health programs and services.  CDPH operates under a framework established by California Health and Safety Code, sections 131000 *et seq.*, supported by regulations found in the California Code of Regulations, including Titles 17, 22, and 27.  These statutory and regulatory provisions govern the Department's authority and duties to deliver public health services across the state with programs designed to address a broad range of population health issues, ensuring public safety and well-being through preventive and responsive health programs.

Title V was created to promote the health of mothers and children and reduce infant mortality through providing prenatal, delivery, and postpartum care for low-income, at-risk pregnant women, and to provide and promote family-centered, community-based coordinated care for children with special healthcare needs and their families.  42 U.S.C. § 701(a)(1)(A), (B), (D).

### 1.  Data Sources that Support CDPH's Programs

CDPH uses many data sources to assess Californians' health, including vital statistics (i.e., births and deaths), surveillance systems and registries (e.g., reportable communicable/infectious diseases case and lab reporting systems, cancer registry), hospital discharge and emergency department visit data, administrative data, surveys, socioeconomic-related data, and others.  Nguyen Decl., ¶ 8.

## 2. The Maternal, Child & Adolescent Health Division (MCAH)

MCAH, a division of CDPH, is focused on an array of efforts to monitor and improve the health and well-being of California's individuals and families. Nguyen Decl., ¶¶ 9–14. MCAH provides health information and data, creates programs to address public health issues, and administers funds to Local Health Jurisdictions (LHJs) and Community Based Organizations through contracts and/or allocation agreements. *Id.*, ¶ 9. MCAH is staffed by a multi-disciplinary team of experts including doctors, nurses, social workers, epidemiologists, data analysts, scientists, and various other health professionals. *Id.*, ¶ 10. MCAH's scientific staff analyzes population-based data to measure and track disparities among California families, and the data is then used to inform strategic planning, programing, and funding decisions. *Id.*, ¶ 11.

The scientific and epidemiologic statistics provide the basis for MCAH's programs to investigate and address these disparities. Nguyen Decl., ¶¶ 15–16. Among these programs are the Black Infant Health (BIH) program and the Perinatal Equity Initiative. *Id.*, ¶ 30. California's "Momnibus" Act (Senate Bill 65, 2021) further codified this commitment to investments in Black maternal and infant health by requiring CDPH to establish the California Pregnancy-Associated Mortality Review Committee (CA-PARC), effective August 1, 2022, to review pregnancy-related deaths, analyze causes of severe maternal morbidity, and recommend prevention strategies—with explicit focus on disparities in maternal health. *Id.*

## 3. MCAH Mission and Programming

MCAH's mission is to provide health information, data, and programs in a culturally sensitive manner that are available to women and their infants. Nguyen Decl., ¶ 53. Each MCAH program is required to ensure the availability of a toll-free telephone system that provides a current list of culturally and linguistically

9

appropriate information and referrals to community health and human resources. *Id*. These resources provide public access to prenatal care. *Id*.

### B.   The Black Infant Health Program

#### 1.   History of the Program

The BIH program was designed and expanded to address a public-health crisis: the significantly disproportionate risk of maternal and infant health outcomes for Black women compared with women and babies in other racial-ethnic groups. Nguyen Decl., ¶ 31.

In 1989, with the passage of Senate Bill 165, Budget Act of 1989, California began to more aggressively address the challenge of improving the health of Black women, infants, and children by providing services in a culturally supportive manner. Nguyen Decl., ¶ 31.  Originally a pilot project at four sites, the BIH program expanded to reach 17 local health jurisdictions where over 90 percent of all Black infants are born in California. *Id*.

In 2006, CDPH/MCAH commissioned the University of California, San Francisco Center on Social Disparities in Health (UCSF/CSDH) to conduct an assessment of the BIH program.  Nguyen Decl., ¶ 32.  The assessment report found that, given the complex and multifaceted root causes of Black perinatal and infant health outcomes, there was no evidence to support any singular, specific, short-term solution to reduce adverse pregnancy and birth outcomes among Black women. *Id*. The BIH program expanded with the goal of developing a program reflecting current scientific knowledge about the individual and community-level factors that influence health and health disparities.

In 2011, CDPH/MCAH began implementing a standardized BIH program that features both (1) a group intervention designed to encourage empowerment and social support and promote health and healthy behaviors; and (2) enhanced one-to-one support to link participants with needed community and health-related services. Nguyen Decl., ¶ 35.  The BIH program provides services in a culturally relevant

10

manner that respects participants' beliefs and cultural values while promoting overall health and wellness, recognizing that women's health and health-related behaviors are shaped by non-medical factors.  *Id*.

### 2.   Statistical Data that Supports the BIH Program

MCAH data demonstrates the existence of severe and persistent racial disparities in infant health outcomes in California, with Black mothers and infants experiencing significantly high perinatal and infancy health risks.  Nguyen Decl., ¶¶ 17–29.  For example, in 2023, the Black infant mortality rate was 8.75 deaths per 1,000 live birth—three times the White rate (2.90) and Asian rate (2.60), and twice the Hispanic rate (4.21).  *Id*., ¶ 17.  This disparity persists despite an overall 25% decline in the Black infant mortality rate since 2000.  *Id*.

Preterm birth (PTB) and low birth weight (LBW) are among the leading causes of infant mortality.  *See* Nguyen Decl., ¶¶ 43–44.  In 2024, the PTB rate among Black infants (12.85%) was nearly double the White rate (7.73%), against a statewide overall rate of 9.07%.  *Id*., ¶ 18.  The LBW rate among Black infants (12.69%) was more than double the White rate (5.84%), against a statewide overall rate of 7.40%.  *Id*., ¶ 18 & fn. 7.

Additionally, although the overall pregnancy-related mortality rate in California declined to 12.0 deaths per 100,000 live births in 2023, down from 21.6 in 2021 and 18.6 in 2020 during the COVID-19 peak, the Black birthing population bears a disproportionate burden.  Nguyen Decl., ¶ 19.  Averaged over 2021–2023, the pregnancy-related mortality rate among Black birthing individuals was 57.8 per 100,000 live births—3.6 times the White rate (15.9), 4.0 times the Hispanic rate (14.3), and 4.3 times the Asian rate (13.3).  *Id*.  And Severe Maternal Morbidity (SMM) disproportionately affects Black mothers[1].  *Id*.  In 2024, the SMM rate among Black mothers was 185.9 events per 10,000 delivery hospitalizations, 76%

---

[1] Use of the terms "Black" "mothers" and "women" is intended to include Black and African American individuals, and birthing individuals who do not identify as women or mothers.

higher than the White rate of 105.6. In 2023, the prevalence of hypertension at delivery among Black women (19.3%) was 33% higher than among White women (14.5%). *Id*.

### 3. Governing Concepts of the BIH Program

All aspects of the BIH program have been developed with attention to four key governing concepts: 1) services are provided in a culturally relevant manner providing care to people with diverse values, beliefs and behaviors, including tailoring delivery to meet participants' social, cultural, and linguistic needs; 2) a client-centered, interactive approach focused on developing goals and strategies that are personalized and realistic; 3) a collaborative strength-based approach that acknowledges individual strengths to foster growth and healthy behavior change; and 4) cognitive skill-building through cognitive behavioral therapy (CBT) that aims to solve problems through a goal-oriented process. Nguyen Decl., ¶ 39.

### 4. Impact of the BIH Program

Pregnant women who enroll in the BIH program receive basic assistance (diapers, baby items, transportation assistance) as well as culturally relevant services. Nguyen Decl., ¶ 40. Enrollees participate in 10 weekly group sessions during pregnancy and 10 weekly postpartum group sessions with other new mothers, and work individually with BIH program staff to develop life-plans. *Id*. All group facilitators are trained by CDPH and MCAH. *Id*.

Importantly, the group-based program sessions are designed to provide participants with a culturally affirming environment to help participants enhance life skills, learn strategies for reducing stress, and build social support. Nguyen Decl., ¶ 41. The BIH program specifically seeks to address racial and socioeconomic disparities in maternal health, recognizing through data-driven research that access to care, resources, and support are not equal for all mothers. *Id*.

### 5. Participation in the BIH Program

Although the program is geared towards addressing the needs of the self-identifying Black and African-American population, who otherwise fall within gestational and post-birth timing parameters, if a prospective participant who does not identify as Black meets these eligibility criteria, and local BIH program staff believe that the individual would benefit from participation in the program, the BIH program representative will contact their designated MCAH-BIH Program Consultant (PC) to facilitate the person's admission.  Nguyen Decl., ¶ 43.

### C. Culturally Specific Interventions

CDPH elected to focus on culturally specific interventions to provide critical supports that participants can utilize to remain physically and mentally well during pregnancy, postpartum, and beyond, and ultimately contribute to improving adverse outcomes.  Nguyen Decl., ¶ 44.  This culturally sensitive focus encourages participation in, and contributes to, positive program outcomes.  *Id.*  It also encourages interpersonal trust within the groups and trust with the government institution.  The BIH program would not be as successful at targeting the disparity in infant mortality and health outcomes in the Black community were it, as compared to other available programs, not to encourage the enrollment of participants who self-identify as Black or African American.  *See* ECF 24-1 (Declaration of Dr. Melissa Franklin in Support of County Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction (Franklin Decl.), ¶ 26).

### D. Comparable Programs and Resources Through the State and LHJs

MCAH's overriding mission to provide health information, data, and programs means that MCAH provides other programmatic options, including culturally sensitive programs, that are available to women and their infants who do not qualify for or are not interested in participation in the BIH.  Nguyen Decl., ¶¶ 53–55.  These programs include the Local Maternal, Child and Adolescent Health

13

Program (offered through the cities and counties) and the California Home Visiting Programs (CHVP), which, in turn, includes Family Connects, Healthy Families America, Nurse-Family Partnership, and Parents as Teachers. *Id.*, ¶ 54.

These programs offer similar services and supports to improve maternal, infant, and/or child-health outcomes and are available to people who meet the eligibility requirements for them. Specific services include referrals to resources, nurse home visiting, and provision of necessary resources to participants. Nguyen Decl., ¶ 55. In Los Angeles County, for example, there are more than 20 different programs overseen by the County's local MCAH Director, aimed at providing support to mothers and infants. Franklin Decl., ¶ 49. While the BIH program serves 450 people per year in Los Angeles County, the other programs for expecting or new mothers, infants, and families overseen by Los Angeles County serve approximately 45,000 people per year. *Id.* County and community programs that serve mothers and infants including the Home Visiting Program, Project HOPE, MAMA's Neighborhood, CHOI, and Shields for Families would have been, and may still be, available to Plaintiff. *Id.*, ¶ 64.

In sum, MCAH is designed to be an evidence-based but flexible program that meets the needs of pregnant women. CDPH and its partners work with prospective enrollees to find the best fit for their needs.

### APPLICABLE LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (*Winter*). A movant seeking a preliminary injunction must establish that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Id.* at 20. "When the government is a party, these last two

14

factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

As the moving party, Jimenez bears the burden of proving each of these elements. *See Klein v. San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). If a movant fails to establish a likelihood of success, the court "need not consider the remaining three [*Winter* elements]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)).

In this case, because Plaintiff's proposed injunction constitutes a mandatory injunction, she has a "doubly demanding" burden to establish that the law and facts "clearly favor" her position. *See Garcia*, 786 F.3d at 740; *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). Any injunction, if ordered, must "be narrowly tailored to give only the relief to which plaintiffs are entitled." *Orantes-Hernandez v. Thornburg*, 919 F.2d 549, 558 (9th Cir. 1990).

## ARGUMENT

I. **AT THE THRESHOLD, PLAINTIFF LACKS STANDING TO SEEK PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff fails to show that she has suffered an injury in fact sufficient to confer standing for her to bring this lawsuit. "'The party invoking federal jurisdiction'" bears the burden of establishing the elements of standing. *American Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). When seeking a preliminary injunction, "'the plaintiff must make a "clear showing" that she is likely to establish each element of standing.'" *Id.* (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). At the preliminary-injunction stage, the Court may consider evidence beyond the four corners of the complaint to determine whether the plaintiff has met her burden to show standing. *See, e.g., California Trucking Association v. Bonta* 996 F.3d 644,

15

652–653 (9th Cir. 2021). And where a plaintiff lacks standing to bring litigation, she has no likelihood of succeeding on the merits of her claims to justify preliminary injunctive relief. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1405 (9th Cir. 1991).

To establish standing, a plaintiff must demonstrate: (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and defendant's conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61 (1992). To meet the injury-in-fact requirement, a plaintiff must demonstrate an invasion of a legally protected interest that is both (1) "concrete and particularized" to them and (2) "actual or imminent," and not hypothetical or conjectural. *Id.* at 560. Where prospective injunctive relief is sought, an alleged threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). A plaintiff has not shown concrete injury if their claims rest solely on an "abstract injury" stemming from "only a general legal, moral, ideological, or policy objection to a particular government action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Here, Plaintiff, on multiple grounds, fails to, and cannot, establish an injury in fact. Firstly, despite her testimony to the contrary, Plaintiff did not seek to enroll in the Pasadena BIH, but stopped at merely submitting an interest form and having an informational call with a Community Services Representative, Ms. Scott. Decl. of McKenzie Scott, ¶¶ 3–6. Submission of an interest form is just a preliminary step before moving forward with the enrollment process, which includes various assessments and completion of the process. *Id.*, ¶ 10. Furthermore, Plaintiff was not, and was not told she had been, denied participation in the program, nor was she asked to identify her race during the call. *Id.*, ¶¶ 6, 9–10. Indeed, Ms. Scott would not have told Plaintiff that she was ineligible during that initial call because that is

16

not her training or her practice. *Id.*, ¶ 10. Only after a prospective applicant has completed the assessment and enrollment process would they be confirmed as admitted to the program. *Id.*

Further, Plaintiff has not presented any evidence that she would have been rejected from the program on the basis of her self-identified race if she had actually sought to enroll. *See* Nguyen Decl., ¶¶ 45–52. CDPH does not have or encourage any policy to reject an applicant to the program based on their race; its own recruitment form does not include any language requesting the prospective participant's race or contain any boxes to record the potential participant's race. *Id.* ¶¶ 45–46. CDPH is also not aware of anyone being turned away, rejected, or disenrolled from the program on the basis of race, including the plaintiff in this case, Erica Jimenez. *Id.*, ¶ 45–52. If Ms. Jimenez, or any other person who does not self-identify as Black or African American, sought to participate in the program, and local BIH staff believe that she would benefit from participation in the program, local BIH staff could enroll the participant regardless of their self-identified race. Nguyen Decl., ¶¶ 45–52; Scott Decl., ¶ 11. Under these facts—Plaintiff's failure to pursue admission to the program, that Plaintiff has not been denied admission to the program, and that her race would not preclude her admission to the program—Plaintiff cannot allege a concrete, "certainly impending" injury caused by the Pasadena BIH based on exclusion from the program that could support a preliminary injunction.

Moreover, the factual dispute based on the differing descriptions by Plaintiff and Ms. Scott of what was said during their single phone call, which is relevant to whether Plaintiff has standing to bring this action, weighs against the requested relief in light of Plaintiff's burden to make a "clear showing" that she is likely to establish each element of standing when seeking a preliminary injunction.

Finally, even assuming the truth of Plaintiff's testimony—that she applied for and was told she was ineligible for the BIH program because she does not identify

17

as Black—Plaintiff has still failed to establish any injury. Plaintiff admits that she was advised of and directed to other available maternity programs and resources for pregnant mothers and infants, and it is undisputed that other such programs and resources exist. ECF 13-5 (Jimenez Decl., ¶ 4); ECF 13-6 (motion at 11); Nguyen Decl., ¶¶ 53-58; Franklin Decl., ¶¶ 49–64; *see also* Scott Decl., ¶¶ 6–8. Yet Plaintiff makes no mention of what services she wanted to receive or whether she took any steps to pursue any of those program alternatives in an effort to obtain those services. It is not clear what exactly Plaintiff believes she is being deprived of because she did not testify that she wants any particular services, including those that could only be accessed through the BIH. ECF 13-5 (Jimenez Decl., ¶ 6). Further, no other evidence independently supports the notion that she pursued alternative program options. Scott Decl., ¶ 12. Thus, because Plaintiff did not seek out any of the alternative prenatal and postpartum services available to her, she cannot show an injury in fact resulting from her alleged exclusion from those services. In other words, her claimed lack of access to programmatic supports is a "harm" entirely of her own making. *Cf. Al Otro Lado v. Wolf,* 952 F.3d 999, 1008 (9th Cir. 2020).

For at least these reasons, Plaintiff lacks standing to move for preliminary injunctive relief, and her motion should be denied on that basis.

## II. PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS OF HER EQUAL PROTECTION OR TITLE VI CLAIMS

Even if Plaintiff established standing to bring this action and to seek a preliminary injunction, she cannot show she is likely to succeed on the merits of her Equal Protection or Title VI claims. For this additional reason, the motion should be denied.

Firstly, the challenged governmental program does not discriminate on the basis of race. The threshold requirement for a race-based equal protection claim is that the challenged governmental action, either on its face or in its manner of

18

enforcement, "results in members of a certain group being treated differently from other persons based on membership in that group." *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999). Plaintiff has not made this showing.

**A.  Plaintiff Is Not Likely to Prevail on the Merits of Her Equal Protection Claim.**

**1.  Strict Scrutiny Does Not Apply Here Because CDPH Does Not Have a Policy of Prohibiting People from Enrolling in the BIH Program Based on Race.**

Even if Plaintiff had alleged a desire to enroll in the BIH to obtain some unnamed service or support, she has not met her burden of establishing that CDPH has a policy of excluding individuals from the program who do not identify as Black or African American.

The "central purpose of the Equal Protection Clause is to prevent the States from purposefully discriminating between individuals on the basis of race." *Hunter ex rel. Brandt v. Regents of Univ. of Cal.*, 190 F.3d 1061, 1069 (9th Cir. 1999) (internal quotations omitted). Here, CDPH does not enforce any policies that would require local BIH sites to prohibit individuals from entering the program, or require individuals to be disenrolled, and it is not CDPH's intent that local BIH programs exclude otherwise eligible individuals from participation based on their race. Nguyen Decl., ¶ 46. Nor does CDPH have any quality control measures, or reporting or review processes, that would require BIH sites to decline admission to or disenroll individuals based on racial criteria. *Id.*, ¶ 47. Consistent with this policy and practice, as noted above, the BIH recruitment form used for all prospective BIH participants does not include a request for that person's race. *Id.*, ¶ 48. In other words, CDPH does not require individuals who do not self-identify as Black or African American to be rejected by local BIH sites. *Id.*, ¶ 45–52.

With respect to actual implementation of the BIH, CDPH program staff are unaware of any instances of an otherwise qualified individual who sought to participate in BIH programs or services but was excluded based on race. Nguyen

19

Decl., ¶ 45, 49, 51. To the contrary, a number of previous BIH participants who did not self-identify as Black or African American have been enrolled at local sites. *Id.*, ¶ 50.

In sum, while the BIH is a program designed to specifically address the unique needs of Black and African American pregnant women and infants with the goal of reducing the disproportionately high infant mortality rate and improving maternal health outcomes in that community, it is not CDPH's policy or practice to deny participation to women of other races who want to take part in it. Nguyen Decl., ¶¶ 45–52. [2] Thus, the record does not establish that Plaintiff, or any other woman who does not identify as Black or African American, is being discriminated against based on her race in access to program services. At most, the record supports the conclusion that CDPH has developed programming that directly addresses and supports concerns surrounding disparities in Black maternal and infant health.

Because the BIH program does not prohibit participation on the basis of race, it does not violate the Equal Protection clause. Accordingly, Plaintiff has not met her burden of proof to be entitled to preliminary injunctive relief.[3]

---

[2] Race-conscious focused outreach and program design does not an implicate equal protection claim. *See, e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) ("School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible.").

[3] Moreover, because there are multiple entry-points to similar types of pregnancy and post-partum resources funded by the State through the MCAH program, whether through the BIH program or another program or initiative within the umbrella program, the principles cited by Plaintiff for her claim of discrimination are fundamentally misplaced. That is, unlike affirmative action programs using race-based criteria that may result in the denial of admission to a university, the MCAH program does not result in exclusion from access to its services based on race. In other words, access to MCAH program services does not implicate the type of "zero-sum" issue present in mandatory college admissions criteria. *See, e.g., Students for Fair Admissions, Inc. v. President and Fellows of*

(continued…)

20

**2.** **The BIH Survives Strict Scrutiny Because It Is Narrowly Tailored to a Compelling Governmental Interest.**

Even if the Court were to conclude that the BIH program discriminates based on race—which it should not—Plaintiff's claims fail because the BIH nevertheless survives strict scrutiny. This is because the BIH program is narrowly tailored to address the State's compelling public health interest in improving and supporting the health of mothers and infants.

"[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena* 515 U.S. 200, 227 (1995). A race-based state action passes strict scrutiny if (1) it serves a compelling governmental interest; and (2) it is narrowly tailored to fulfill that interest. *Hunter*, 190 F.3d at 1063. The BIH satisfies both elements of this analysis.

**a.** **The BIH Program Serves the State's Compelling Interest in Supporting Maternal Health and Reducing the Disproportionately High Infant and Maternal Mortality Rate in the Black Community.**

CDPH and its co-defendant local partners have a compelling interest in supporting and improving the health of mothers and infants in the State, which necessarily includes addressing the public health crisis of the disproportionately high rates of Black infant mortality and pregnancy mortality for Black mothers.

It is well-established that States have a compelling interest in protecting and supporting public health, and addressing public health crises. *See, e.g.*, *Buchwald v. University of New Mexico School of Medicine*, 159 F.3d 487, 498 (9th Cir. 1998) ("public health is a compelling government interest"); *Globe Newspaper Co. v.*

*Harvard Coll.*, 600 U.S. 181, 219 (2023) (*Students for Fair Admissions, Inc.*) ("College admissions are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter."). Because the MCAH program does not prevent non-Black individuals from accessing its services and supports for expectant and new mothers, Plaintiff's Equal Protection claim fails.

21

*Superior Ct. for Norfolk County,* 457 U.S. 596, 607 (1982) (recognizing a compelling government interest in "safeguarding the physical and psychological well-being of a minor")*; Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 18 ( 2020) (stemming the spread of COVID-19 is unquestionably a compelling interest); *Jacobson v. Massachusetts,* 197 U.S. 11, 25 (1905) (state has a "compelling" interest in protecting the health and safety of its residents, including the students in its schools, by preventing the spread of communicable diseases.)  As previously observed by the Supreme Court, "it may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification." *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 310 (1978).  The Ninth Circuit has similarly stated that, in the context of medical treatment, "[i]t is not difficult to imagine the existence of a compelling justification" for race-based classifications. *Mitchell v. Washington*, 818 F.3d 436, 446 (9th Cir. 2016).

The disproportionately high mortality rates affecting Black mothers and infants across income levels is a readily-observable, empirical fact supported by extensive data.  Nguyen Decl., ¶¶ 17–29; Franklin Decl., ¶¶ 17–27.  Indeed, Plaintiff's complaint concedes this reality.  ECF 1 (Compl., ¶ 16).  Thus, substantial scientific evidence and data establishes the existence of a significant public health issue that the State clearly has a significant interest in addressing.  Nguyen Decl., ¶¶ 17–29; Franklin Decl., ¶¶ 17–27.  Moreover, this public health crisis is the precise kind of "at-risk" issue Congress intended to address in granting California Title V funding.  42 U.S.C. § 701(a)(1)(A), (B), (D).  The California Legislature recognized the compelling need to address the disparity between Black and non-Black populations in infant mortality.  In establishing the BIH program, it set forth findings that "there continues to be a statewide gap between mortality rates for Black infants and those for other population groups," and that "the rate of mortality

among Black infants continues to be two to four times higher than the rates for other groups statewide." Cal. Health & Saf. Code § 123259(a).

Plaintiff argues that "the only compelling interest applicable to BIH is remedying specific, identified instances of past discrimination that violated the Constitution or a statute," and that CDPH lacks the required evidence of specific instances of past discrimination to justify the BIH. ECF 13-6 (Mot. at 12-13) (*citing Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206-07 (2023).) But Plaintiff's exclusive reliance on the line of Supreme Court cases addressing racial preferences in school admissions to argue that Defendants here must make a showing of specific examples of past discrimination is fundamentally misplaced. *Id*. As discussed above, the BIH is not an affirmative action program, and its goal is not to remedy past discrimination against Black mothers; it is, instead, a public-health initiative designed and targeted to mitigate and remedy a public-health emergency that is ongoing, very much of the moment, and the result of numerous factors and variables. Accordingly, the relevant analysis here is whether CDPH has a compelling interest in addressing a particularly pernicious public health and welfare issue. Unlike affirmative action programs to prioritize the admission of students of certain races for the express purpose of redressing past racial discrimination, the BIH Program was established to help mitigate, and eventually eliminate, a public health crisis.

While racism has been identified as one of the reasons that the health of Black mothers and infants is disproportionately impacted (*see, e.g.,* Nguyen Decl., ¶¶ 20–21), the BIH program is not designed to remediate past discrimination, but rather is intended to improve health outcomes right now and moving forward (*see id*., ¶ 16; Franklin Decl., ¶¶ 19–27). As the Ninth Circuit explained in *Hunter*, 190 F.3d at 1064 fn. 6, the particular analysis used for race-based remedial programs does not extend to the use of race for other, non-remedial purposes.

23

In *Hunter*, the appellant argued that only an interest in remedying past discrimination could justify the use by an elementary school operated as a research lab at UCLA's Graduate School of Education and Information Studies of race/ethnicity as a factor in its admissions process. The court rejected that argument as simply wrong, stating that, "[t]he Supreme Court has never held that only a state's interest in remedial action can meet strict scrutiny," nor had the Ninth Circuit. *Id*. at fn. 6. Instead, the Ninth Circuit made clear that its prior rulings concluded only that, in the particular case "where the asserted state interest *is* remedying past discrimination, this remedial interest must be supported by concrete evidence of discrimination." *Id*. (emphasis in original).[4] This is not one of those cases: CDPH is not seeking to remedy past discrimination, but is focused on furthering the public health and welfare, including in large part through developing programs to address particular issues affecting particular populations on a daily basis, namely, in this case, Black women and infants who are dying at disproportionately high rates due to adverse pregnancy and birth outcomes.

In sum, the Supreme Court's holdings that a strong evidentiary basis is needed to support an interest in remedying past discrimination in the affirmative action context simply have no bearing on the question whether a non-remedial interest, such as, for example, "the operation of a research oriented elementary school dedicated to improving the quality of education in urban public schools, can serve as a compelling interest sufficient to survive strict scrutiny." *Hunter*, 190 F.3d at 1064 fn. 6. The State's non-remedial interest here in improving the health of Black

---

[4] The Supreme Court's recent decision, *Louisiana v. Callais*, 2026 WL 1153054, *10, explained that the Court's precedents had identified two compelling interests to date that can satisfy strict scrutiny, one of which is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," which Plaintiff argues applies here. But the Supreme Court used the opportunity to examine "whether compliance with the Voting Rights Act should be added to our very short list of compelling interests that can justify racial discrimination," thus confirming that the two compelling interests previously identified in the race-based discrimination context are not intended to foreclose consideration of whether other compelling interests can satisfy strict scrutiny. *Id.*

mothers and infants facing a significant mortality rate problem is a compelling interest that does not require a showing of past discrimination to survive strict scrutiny.

CDPH's evidence amply demonstrates that the BIH program furthers the State's compelling interest in mitigating a serious public health problem.

### b.    The BIH Program Is Narrowly Tailored to Serve the State's Compelling Public Health Interest.

The BIH program is also narrowly tailored to serve CDPH's compelling interest in reducing the high mortality rates of pregnant Black mothers and their infants.

The BIH program addresses a critical, endemic health concern for a significant demographic in California, and does so under a framework that is empirically justified by research, studies and data.  Nguyen Decl., ¶¶ 31–41; Franklin Decl., ¶¶ 22–25.  As the evidence demonstrates, the BIH is comprised of numerous components specifically geared towards addressing this unique problem.  To better meet the health-related needs of pregnant and postpartum Black women and their infants, the program features both: (1) a group intervention designed to encourage empowerment and social support in the context of a life course perspective; and (2) enhanced one-to-one support to link participants with needed community and health-related services.  Nguyen Decl., ¶ 35.  This program thus provides services in a culturally relevant manner that respects participants' beliefs and cultural values while promoting overall health and wellness, recognizing that women's health and health-related behaviors are shaped by non-medical factors (e.g., the effects of stress related to limited social and economic resources as well as racism and discrimination).  *Id*.

A program that is not designed to address the specific needs of Black mothers and infants would not effectively address the pregnancy and infant mortality crisis.  A program based solely on socioeconomic factors would not be as effective,

because the evidence shows that the health risks to Black women and infants exist across income and education lines.  Nguyen Decl., ¶¶ 17–28, 36; Franklin Decl., ¶18.  The evidence also shows that other types of interventions have not been successful in addressing this public health issue.  Franklin Decl., ¶¶ 21-22, 26.

Also, the program provides Black mothers with health-related information in a culturally appropriate manner that is cognizant of internalized racism to increase engagement of this subpopulation with the program.  Nguyen Decl., ¶ 35.

In sum, the State has determined, based on the research and data, that the BIH program is needed to adequately address the public health crisis of disproportionately high mortality rates and other adverse health outcomes affecting pregnant Black women and infants, and that a more generalized program lacking such a focus would not be as effective at achieving that goal.  As the Ninth Circuit has emphasized, in evaluating whether the use of race/ethnicity in a program is narrowly tailored, courts should avoid second guessing and defer to the legitimate informed judgments of researchers and academics regarding what is needed to achieve their goal.  *Hunter*, 190 F.3d at 1066-67 (observing that "no one would challenge" a decision of medical school to explicitly consider ethnicity when selecting study participants for research that occurs predominately in a particular population, such as limiting participants to Black children for a study on the prevention of sickle-cell anemia).  *Id.*, n.11.  Further, narrow tailoring "does not require exhaustion of every conceivable race-neutral alternative."  *Grutter v. Bollinger,* 539 U.S. 306, 339 (2003).

That the BIH program is narrowly tailored is further evidenced by the fact that CDPH policy permits an otherwise qualified woman to participate in the program even if she does not self-identify as Black or African American.  *See* Section II.A.1, *supra*.  This evidence contradicts Plaintiff's unsupported allegation that "BIH's racial eligibility cannot be waived," and that the "program's criteria do not provide any flexibility that would allow a non-black mother of a non-black infant to

participate." ECF 13-6 (Mot. at 15). Thus, the BIH does not categorically or inflexibly exclude individuals based solely on race. See *Western States Paving Co., Inc. v. Washington State Dept. of Transp.*, 407 F.3d 983, 993 (9th Cir. 2005).

Plaintiff also argues that the BIH program is not subject to reasonable durational limits. ECF 13-6 (Mot. at 16) (citing *Students for Fair Admissions, Inc.*, 600 U.S. at 227-228). As discussed above, however, this case is distinguishable from *Students for Fair Admissions* and other affirmative action cases that discuss the need for a logical end point in the context of a race-based affirmative action program. In any event, the BIH program has 5-year goals and logical end points informed by the program's success in achieving its stated goals. For example, it aims to reduce negative health outcomes for Black women and Black infants by 2030 by specific and measurable amounts. Nguyen Decl., ¶ 38; *Cf. Students for Fair Admissions, Inc.*, 600 U.S. at 214 (race-related admissions goals failed because those goals were neither "sufficiently coherent" to survive strict scrutiny, nor readily measurable).[5]

For these reasons, Plaintiff is unlikely to succeed on the merits of her Equal Protection claim.

**B.   Because the BIH Program Does Not Impose a Racial Classification that Violates the Equal Protection Clause, Plaintiff's Title VI Claim Is Not Likely to Succeed on the Merits.**

For the same reasons discussed above, Plaintiff's Title VI claim fails.

Title VI prohibits discrimination "under any program or activity receiving Federal financial assistance" on the basis of "race, color, national origin." 42

---

[5] Plaintiffs argue that the BIH program uses the race of non-Black applicants and their babies as a negative by "categorically" excluding them from the program on that basis. ECF 13-6 (Mot. at 15). But, as previously discussed, the program does not categorically exclude non-Black applicants. Instead, CDPH has a policy not to exclude on the basis of race individuals who want to be part of the program and otherwise meet program criteria. Nguyen Decl., ¶¶ 45–52. In addition, Plaintiffs' argument that the State is using race as a stereotype is wholly misplaced. *See id*. As set forth above, the program's focus on supporting Black and African American participants with culturally relevant material is based on scientific data and empirical evidence establishing a public health crisis that affects Black women and their infants across socioeconomic lines, not on any stereotypes.

27

U.S.C. § 2000d. But Title VI "'on its own bottom reaches no further than the Constitution.'" *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 736 (9th Cir. 2021) (quoting *Guardians Ass'n v. Civ. Serv. Comm'n of New York*, 463 U.S. 582, 589–590 (1983)). Thus, Title VI only bars "'racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.'" *Id.* (quoting *Bakke*, 438 U.S. at 287).

Here, as discussed above, the BIH program satisfies strict scrutiny because it is narrowly tailored to serve a compelling governmental interest in addressing the significant public health crisis facing Black mothers and infants. There is, therefore, no Equal Protection violation. Because Plaintiff lacks a viable Equal Protection claim, and does not raise a Fifth Amendment claim, Plaintiff's Title VI claim against the BIH program also fails.

III. **PLAINTIFF FAILS TO SHOW THAT SHE FACES LIKELY IRREPARABLE HARM DUE TO HER ALLEGED EXCLUSION FROM THE BIH PROGRAM**

Here, for many of the same reasons she lacks standing, Plaintiff cannot establish that she faces irreparable harm. To obtain a preliminary injunction, the movant "must establish that irreparable harm is *likely*, not just possible[.]" *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) (emphasis in original) (internal citations omitted). Plaintiff cannot make such a showing.

First, Plaintiff cannot establish that she will suffer imminent harm absent an injunction, because, as discussed above, CDPH does not have a policy of prohibiting otherwise qualified people who do not identify as Black or African American from participating in the program, and she has not yet sought admission to the program. *See* Argument sections I, II.A, *supra*. The City of Pasadena's evidence instead establishes that Plaintiff has not yet applied for, been considered for, or been rejected from participation. *See id*. Nothing is preventing Plaintiff from applying for the BIH program now.

Second, Plaintiff may also avail herself of other comparable resources and supports offered by CDPH and its partners; to date, no evidence exists to suggest she has done so.  Indeed, as previously noted, although Plaintiff admits that the City informed her of other maternal and infant resources and services, she fails to establish, and the record does not demonstrate, that she has attempted to pursue them in any way.

Defendants offer a variety of other resources for pregnant mothers and infants that are similar to the ones she seeks from the BIH program.  Nguyen Decl., ¶¶ 53–57; Franklin Decl., ¶¶ 49–65; Scott Decl., ¶¶ 6–8.  Plaintiff concedes that she was informed about other resources when she spoke to a program representative from Pasadena, but she does not testify that she has actually availed herself of any of them.  Jimenez Decl., ¶ 4.  As noted above, self-created harms, such as Plaintiff's failure to seek similar services offered to her through other MCAH or LA County or City of Pasadena programs, do not constitute irreparable harm.  *Al Otro Lado*, 952 F.3d at 1008; *Second City Music Inc. v. City of Chicago, Ill.*, 333 F.3d 846, 850 (7th Cir. 2003).

**IV.  BECAUSE THE BIH PROGRAM PROMOTES THE HEALTH AND SAFETY OF BLACK MOTHERS AND INFANTS, THE PUBLIC INTEREST WEIGHS AGAINST JIMENEZ'S REQUESTED PRELIMINARY INJUNCTION**

The public interest heavily weighs in favor of the State's important public health program, and against any attempt to alter the BIH program's focus on addressing the high rate of pregnancy-related and infant mortality impacting Black mothers and infants.

The public interest "weighs strongly" in favor of denying injunctive relief regarding state actions and policies that "promote the health and safety" of the public. *Doe v. San Diego Unified Sch. Dist.* (9th Cir. 2021) 19 F.4th 1173, 1181 (9th Cir. 2021) (public interest weighed against enjoining school district's vaccine mandate because the vaccines administered under that mandate were "safe and effective at preventing COVID-19").  Here, the public interest weighs against

29

altering the content and focus of the BIH program, which promotes statewide the health of a significant at-risk population, to the extent that is what Plaintiffs seeks through this litigation.

The BIH program was specifically designed to meet the needs of that at-risk population and improve their pregnancy-related health outcomes, including by creating a culturally sensitive framework that encourages Black mothers to engage with the program in the first place. Nguyen Decl., ¶¶ 38, 55. The program has already seen some success in reducing the mortality and other pregnancy-related risks detrimentally impacting Black mothers and infants across socioeconomic levels, but the problem remains. *Id*., ¶ 38 & fns. 31, 36. Thus, and as detailed in the supporting declarations of Dr. Rita Nguyen and Dr. Melissa Franklin, the BIH program would not be as successful at addressing the disparity in the pregnancy-related and infant mortality rates in the Black community without its focus on Black and African American women and infants. Nguyen Decl., ¶¶ 32, 44; Franklin Decl., ¶¶ 24-27. If the program is enjoined in its current form, it appears likely that the significant health risks to that group would not be adequately addressed, causing serious harm to public health in this State.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be denied.

---

[6] To the extent the Court is inclined to grant Plaintiff's motion, the consequential injunctive relief should be limited to Plaintiff only. "[D]istrict courts likely lack authority to issue 'universal injunctions'—orders that 'prohibit enforcement of a law or policy against anyone'—to the extent 'broader than necessary to provide complete relief to each plaintiff.'" *Vasquez Perdomo v. Noem*, 148 F.4th 656, 686 (9th Cir. 2025) (*quoting Trump v. CASA, Inc*., 606 U.S. 831, 837, 861 (2025)). Here, Plaintiff has not established sufficient grounds for provisional class certification or otherwise shown any harm to putative class members. Indeed, to date, she has not sought any such certification—provisionally or otherwise—from the Court. *See* Fed. R. Civ. P. 23. Thus, any injunctive relief issued by this Court need not extend any further than Plaintiff herself in order to afford her the complete relief she requests, which is to participate in the BIH program. *See, e.g*., ECF 13-6 (Mot. at 19:25-27).

Dated:  May 7, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JENNIFER G. PERKELL
Supervising Deputy Attorney General
JENNIFER C. ADDAMS
Deputy Attorney General
JOSÉ PABLO GALÁN DE LA CRUZ
Deputy Attorney General

*Jennifer Bunshoft*

JENNIFER A. BUNSHOFT
Deputy Attorney General
*Attorneys for Defendant Dr. Erica
Pan, in her official capacity as
Director of the California Department
of Public Health*

LA2026301941
39815988

31

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Dr. Erica Pan, in her official capacity as Director of the California Department of Public Health, certifies that this brief contains 7521 words, which:

_x_ complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated.

Dated: May 7, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JENNIFER G. PERKELL
Supervising Deputy Attorney General
JENNIFER C. ADDAMS
Deputy Attorney General
JOSÉ PABLO GALÁN DE LA CRUZ
Deputy Attorney General

*Jennifer Bunshoft*

JENNIFER A. BUNSHOFT
Deputy Attorney General
*Attorneys for Defendant Dr. Erica Pan, in her official capacity as Director of the California Department of Public Health*

32

# CERTIFICATE OF SERVICE

Case Name:   **Erica Jimenez v Dr. Erica Pan,**          No.      **2:26-cv-03500-SPG-SP**
             **et al.**

I hereby certify that on <u>May 7, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT DIRECTOR OF THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH ERICA PAN'S CORRECTED OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>May 7, 2026</u>, at Concord, California.


C. Murphy                                              *C. Murphy*
Declarant                                              Signature

LA2026301941
45067100