**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERICA JIMENEZ, individually and on behalf of a class of similarly situated individuals,<br>Plaintiff,<br>v.<br>ERICA PAN, M.D., in her official capacity as Director of the California Department of Public Health; BARBARA FERRER, M.D., in her official capacity as Director of the Los Angeles County Department of Health; MANUEL CARMONA, in his official capacity as the Director of Public Health for the Pasadena Pubic Health Department; LOS ANGELES COUNTY DEPARTMENT OF PUBIC HEALTH; and PASADENA PUBLIC HEALTH DEPARTMENT,<br>Defendants. | Case No. 2:26-cv-03500-SPG-SP<br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 13]** |

Before the Court is a Motion for Preliminary Injunction, (ECF No. 13 ("Motion")), filed by Plaintiff Erica Jimenez ("Plaintiff") in this civil case brought against defendants Dr. Erica Pan, in her official capacity as Director of the California Department of Public

Health ("CDPH"); Dr. Barbara Ferrer, in her official capacity as Director of the Los Angeles County Department of Public Health ("LCDPH"); the Los Angeles County Department of Public Health (together with Dr. Ferrer, "County Defendants"); Manuel Carmona, in his official capacity as Director of Public Health for the Pasadena Public Health Department ("PPHD"); and the Pasadena Public Health Department (together with Carmona, "Pasadena Defendants") (collectively, "Defendants"). *See* (ECF No. 1 ("Compl.")).

The Motion requests an order enjoining the Defendants while this case is pending "from implementing the racial eligibility criterion for applying to and participating in the Black Infant Health Program" (the "BIH Program" or "Program"). (Mot. at 2). Defendants oppose the Motion, arguing Plaintiff lacks standing to obtain the relief she requests and has failed to show a preliminary injunction is warranted. Additionally, Defendants argue the Program satisfies strict scrutiny because it furthers a compelling government interest in, among other goals, reducing the much higher mortality rates of Black infants, as compared to non-Black infants, and is narrowly tailored to meet that interest.

Having considered the parties' submissions, oral arguments, the relevant law, and the record in this case, the Court DENIES the Motion because Plaintiff has not established she has standing to obtain the requested injunctive relief.

## I. FACTUAL BACKGROUND

### A. BIH Program Origin[1]

Before 1989, persistent and significant disparities in key health indicators between Black and non-Black individuals were well documented. In 1985, the United States

---

[1] Both Plaintiff and County Defendants request the Court take judicial notice of certain information made available on specific government websites. *See* (Memo at 8 n.1); (ECF No. 24-20 ("Ds' RJN")). County Defendants also request the Court judicially notice the relevant legislative history for the Program. *See* (Ds' RJN). No party has objected to the requests for judicial notice. The Court grants the parties' requests for judicial notice, as the facts on the government-maintained websites are not subject to reasonable dispute, and the legislative history of the statute is a proper subject for judicial notice. *See* Fed. R. Evid. 201(b); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (judicial

Department of Health and Human Services ("HHS") released its "Report of the Secretary's Task Force on Black and Minority Health," a multi-volume study known as the "Heckler Report," which was commissioned and led by then Secretary of HHS, Margaret M. Heckler. U.S. Dep't of Health & Hum. Servs., Report of the Secretary's Task Force on Black and Minority Health (1985) ("Heckler Report"); *see also* (ECF Nos. 24-16–24-19) (excerpts of Heckler Report presented for judicial notice). The Task Force, made up of nineteen (19) senior scientists and health officials, supported by a wide range of health professions, researchers, and experts in the health field, undertook a "landmark effort in analyzing and synthesizing the [then] present state of knowledge of the major factors that contribute to the health status of Blacks, Hispanics, Asian/Pacific Islanders and Native Americans." Heckler Report, Volume 1: Executive Summary, at 7. From this effort, the Task Force's findings identified infant mortality as one of six causes of death that together accounted for more than eighty (80) percent of the excess mortality observed in Black populations as compared to the White population. (ECF No. 24-16, Ex. N, at 5–6). The Task Force recommended, among other interventions aimed at minority pregnant women, "using counseling and other support services for non-medical risk factors (such as stress, type of employment, transportation/child care problems)" and "[d]eveloping a comprehensive education and information campaign on avoidable risks to maternal and fetal health during pregnancy." (ECF No. 24-19, Ex. Q, at 3).

In 1989, the California Legislature passed Senate Bill 165, Budget Act of 1989, expressing its intent to appropriate funds for "new and innovative projects to reduce the rate of black infant mortality in California." *See* Budget Act of 1989, ch. 93, 1989 Cal. Stat. 622–23; *see also* (ECF No. 24-6 ("Budget Act of 1989") at 12). Senate Bill 165

---

notice is proper where it is "made publicly available by government entities" and "neither party disputes the authenticity of the websites or the accuracy of the information displayed therein"); *see also Calm Ventures LLC v. Newsom*, 548 F. Supp. 3d 966, 974 (C.D. Cal. 2021) (judicially noticing health information and policies published by the state of California and Centers for Disease Control); *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice.").

instructed the California Department of Health Services, a predecessor to the CDPH, to put the funds to, among other uses, establishing "policies, procedures, and programs designed to eliminate the disparity between the black and non-black populations in infant mortality." (Budget Act of 1989 at 13). The BIH Program was thus created with a target population and public health initiative in mind. Originally, the Program started as a pilot project at four sites, but soon expanded to seventeen (17) Local Health Jurisdictions ("LHJ") where over 90% of African American births occur in California. (ECF No. 26-1 ("Nguyen Decl.") ¶ 31) (declaration of Dr. Rita Nguyen).

In 1993, the State commissioned the University of Southern California to assess the effectiveness of the BIH Program in lowering Black infant mortality rates and to provide a scientific basis for intervention improvements. *See Black Infant Health Program*, Pasadena Pub. Health Dep't, https://www.cityofpasadena.net/public-health/black-infant-health-program/ (last visited Aug. 28, 2026) ("PPHD BIH Program Historic Overview"). At the time, the primary focus of the original BIH Program was to encourage participants to obtain prenatal care. *Id.* This 1993 assessment, however, determined that participants in the BIH Program faced non-clinical needs prenatal care alone could not resolve. *Id.* It recommended a multi-pronged approach to address the varied needs of both the participants and fathers of infants by utilizing the following six different intervention strategies: Prenatal Outreach and Care Coordination, Comprehensive Case Management, Social Support and Empowerment, Health Behavior Modification, Chronic Disease Prevention, and The Role of Men. *Id.*

In 2006, CDPH/MCAH commissioned the University of California San Francisco, Center on Social Disparities in Health, to assess the statewide BIH Program and recommend improvements based on then-current data. (ECF No. 24-1 ("Franklin Decl.") ¶ 23) (declaration of Dr. Melissa Franklin). This 2006 report concluded that solely receiving prenatal care would not close the black infant mortality disparity gap and that group-based interventions emphasizing social support and empowerment demonstrated positive effects. (*Id.*). The BIH Program was therefore modified to include "culturally

affirming group sessions and life planning, which improved birth outcomes by addressing social stressors and supporting healthier behaviors." (*Id.*).

Nevertheless, despite a gradual decline thereafter in African American infant mortality, the disparity in infant mortality and rates of preterm and low birth weights persisted. (*Id.*). Using data from California for the period from 2007 to 2016, a study found that the preterm birth rate ranged from 11.7 % to 14.9% and rates of low birthweight ranged from 11.2% to 14.3% for infants born to Black mothers as compared to the range of rates of preterm birth of infants born to White mothers (8.2% to 11.4% and 6.3% to 8.8%, respectively). (Nguyen Decl. ¶ 25). A national study, using data for live births in the United States for the period from 2015 to 2017 that included only births among women with private insurance, similarly found that "rates of preterm birth (less than 37 weeks gestation) remained highest for women who identified as Black, intermediate for women identifying as both Black and White race, and lowest for White women (9.9% vs. 6.1% vs. 5.5%, respectively)." (*Id.* ¶ 26). Additionally, college-educated Black women were reported to have "higher rates of pregnancy-related mortality (40.2 pregnancy-related deaths per 100,000 live births) than White women with less than a high school degree (25.0 pregnancy-related deaths per 100,000 live births)." (*Id.* ¶ 27).

In 2023, the Legislature "expand[ed] the scope of interventions provided" under the Program through the enactment of Assembly Bill 1701, which modified California Health and Safety Code sections 123259 and 123260. 2023 Cal. Stat. ch. 174; *see* (ECF No. 24-7 ("AB 1701 Assembly Hearing")). In doing so, the Legislature specifically found,

> [T]here continues to be a statewide gap between mortality rates for Black infants and those for other population groups. While there have been modest but statistically significant declines in infant mortality generally, including a decline in Black infant mortality, the rate of mortality among Black infants continues to be two to four times higher than the rates for other groups statewide. Furthermore, preterm birth, which is the leading cause for infant death, has increased for the third straight year in California. The social support, stress management, and empowerment model of the Black Infant Health Program is an evidence-informed intervention program designed to

> reduce Black infant mortality. Other interventions that show promise but do not currently receive state support would enhance the impact of current funding for Black infant health.
>
> It is the intent of the Legislature to promote the establishment of Community Centers of Excellence in perinatal health based on public health science concerning the causes of persistent inequality and current best practices to narrow the gap.

Cal. Health & Safety Code § 123259.

Comments by the California Senate made in support of Assembly Bill 1701 reaffirmed that the "goal of the BIH program is to improve African-American infant and maternal health, as well as decrease black-white health inequities and social inequities for women and infants." (ECF No. 24-8 ("AB 1701 Senate Hearing)" at 3). The Legislature stated that the Program "serves African-American women who are 18 years or older and up to 30 weeks pregnant at the time of enrollment." (*Id.*). As currently implemented, the Program offers services by "family health advocates, group facilitators, public health nurses, and social workers." (*Id.* at 4).

**B. BIH Program's Implementation**

The CDPH oversees and implements health programs for the State of California. *See* (Nguyen Decl. ¶¶ 4, 9). Within the CDPH is the Center for Family Health branch, Maternal, Child and Adolescent Health Division ("MCAH"), which administers public funds to Local Health Jurisdictions "to promote the health of women of reproductive age, pregnant people, mothers, infants, children, and adolescents in California." (*Id.* ¶¶ 4, 9, 42).

1. <u>MCAH's Data Collection</u>

As part of its public health mission, MCAH "analyzes population-based data—including vital records (births, deaths, and fetal deaths), hospital records (emergency department, inpatient, and outpatient), and population-representative surveys—to measure, track, and highlight health disparities among California families." (*Id.* ¶ 11). According to Dr. Rita Nguyen, who is the Assistant Public Health Officer for the State of California

and, among other roles, oversees the state's Center for Family Health, "CDPH uses epidemiologic data to identify the populations and geographic areas where public health interventions will have the greatest impact." (*Id.* ¶ 15). The data is based on many "population-level data sources, including, but not limited to, vital statistics (i.e., birth, death, birth cohort), hospitalizations, the Maternal and Infant Health Assessment (MIHA) and the California Pregnancy Mortality Surveillance System (CA-PMSS)" that is compiled, analyzed, and reported to the public. (*Id.* ¶ 13).

Dr. Nguyen attests that data and studies show that racial discrimination, as well as social and economic stressors, have "contribute[d] to poor birth outcomes for Black pregnant and post-partum people and infants," but that the BIH Program's interventions are making headways in addressing these issues. (*Id.* ¶¶ 16, 16 n.5). Out of 1,571 participants in the Program between 2015–2018, there was a "45% decrease in food insecurity," "38% increase in the use of yoga, deep breathing, and/or meditation to manage stress," and "35% decrease in depressive symptoms." *Black Infant Health Data Brief*, Cal. Dep't of Pub. Health, at 2–3, https://www.cdph.ca.gov/Programs/CFH/DMCAH/BIH/CDPH%20Document%20Library/Data-Briefs/BIH_Data_Brief_Intermediate_Outcomes_2015-2018.pdf (last visited Aug. 28, 2026). Additionally, Ms. Franklin represents that the Program "serves approximately 450 individuals annually" in Los Angeles County. (Franklin Decl. ¶ 45).

However, the data shows "persistent racial disparities in infant health outcomes" in California, where Black infants "die at disproportionately high rates" compared to their non-Black counterparts. (Nguyen Decl. ¶ 17). Despite a 25% decline since 2000, in 2023, the rate of Black infant deaths "remained 3 times higher than the White and Asian rates (8.75 vs. 2.90 and 2.60 deaths per 1,000 live births, respectively), and 2 times higher than the Hispanic rate (4.21)." (*Id.* ¶¶ 17, 17 n.6). Based on data gathered by MCAH, preterm birth weights in Black infants and low birth weight reflect the same disparate patterns, with the preterm birthrate in 2024 among Black infants being (12.85%), which was nearly double the rate of preterm birth weights of White infants (7.73%), and the low birth weight

among Black infants (12.69%) being more than double the low birth rate for White infants (5.84%). (*Id.* ¶¶ 18, 18 n.7). Additionally, "the pregnancy-related mortality rate among Black birthing individuals was 57.8 per 100,000 live births—3.6 times the White rate (15.9), 4.0 times the Hispanic rate (14.3), and 4.3 times the Asian rate (13.3)" and "the Severe Maternal Morbidity and hypertension at delivery follow[ed] the same pattern." (*Id.* ¶ 19).

According to Dr. Nguyen, "[p]eer-reviewed research demonstrates that Black women experience accelerated biological aging—termed "weathering"—as a result of cumulative, race-based physiological stress." (*Id.* ¶¶ 21, 21 n.12). Additionally, according to Dr. Nguyen, surveys have shown "Black women experience discrimination in maternity care at rates exceeding all other groups." Specifically, "[a] 2023 nationwide survey found that 40.1% of Black respondents experienced at least one form of discrimination during maternity care—the highest prevalence of any racial or ethnic group surveyed, compared to an overall rate of 28.9%." (*Id.* ¶¶ 29, 29 n.25).

2. <u>MCAH's Programming Decisions</u>

Dr. Nguyen attests that CDPH/MCAH identifies "the populations and geographic areas where public health interventions will have the greatest impact" and has "targeted programmatic investments in Black maternal and infant health [to] address these disparate outcomes," including by establishing the BIH Program. (*Id.* ¶¶ 15, 29). The California legislature, through the so-called "Momnibus" Act, SB 65, 2021, further codified the CDPH's "commitment by requiring CDPH to establish the California Pregnancy-Associated Mortality Review Committee (CA-PARC), effective August 1, 2022, to review pregnancy-related deaths, analyze causes of severe maternal morbidity, and recommend prevention strategies—with explicit focus on racial and socioeconomic disparities in maternal health." (*Id.* ¶ 30).

The stated goal of the BIH Program is "achieving healthy pregnancy and birthing outcomes for Black infants, women, and birthing people." *Black Infant Health*, Cal. Dep't of Pub. Health, https://www.cdph.ca.gov/Programs/CFH/DMCAH/BIH/Pages/default.

aspx (last visited Aug. 28, 2026) ("*Black Infant Health*"); *see* Cal. Health & Safety Code § 123255; (Nguyen Decl. ¶¶ 9, 31).[2] According to Dr. Nguyen, this goal is achieved by addressing disparate outcomes in Black infant mortality and targeting racial and socioeconomic disparities in maternal health. (*Id.* ¶ 41). The standardized BIH Program "features both: (1) a group intervention designed to encourage empowerment and social support while promoting healthy behaviors, and (2) one-to-one support to link participants with needed community and health-related services." (*Id.* ¶ 35). Mothers enrolled in the BIH Program "participate in group-based intervention, including 10 weekly group sessions during pregnancy and 10 weekly postpartum group sessions," which are designed to provide participants "with a culturally affirming environment" to aid participants in enhancing "life skills, learn strategies for reducing stress, and build social support." (*Id.* ¶¶ 40–41). BIH Program participants also "work individually with BIH Program staff in a structured life-planning process designed to complement [and] reinforce their group experiences." (*Id.* ¶ 40). Additionally, the BIH Program provides enrollees with basic assistance; referrals to pertinent services; and informational material covering a variety of topics, including prenatal, postnatal, and newborn care, family planning, and stress management, all with "a core focus of reduc[ing] maternal stress and foster[ing] a sense of community between new or expecting Black mothers and their families." (Franklin Decl. ¶ 28); *see also* (ECF No. 24-15, Ex. M) (describing resources and services provided by the BIH Program); *Black Infant Health*.

3. <u>MCAH's BIH Program Outreach</u>

The CDPH/MCAH provides a recruitment form to local BIH sites, entitled the "BIH Recruitment Form," to be used by Program staff during intake when recruiting possible participants. (Nguyen Decl. ¶ 42); *see also* (ECF No. 26-2, Ex. A ("CDPH Recruitment

---

[2] Section 123255 of the California Health & Safety Code sets forth CDPH's allocation of funds for maternal and child health programs in California counties. *See* Cal. Health & Safety Code § 123255. CDPH sets forth standard policies and procedures and distributes funds for administration of the Program. (Nguyen Decl. ¶¶ 4, 42).

Form")). The CDPH Recruitment Form has sections for the participant's name, home address, date of birth, mailing address and best contact telephone number. *See* (CDPH Recruitment Form at 2). The CDPH Recruitment Form also contains a section to be completed by BIH Program staff that lists various reasons why a possible participant may not be enrolled in the program, including that the staff was unable to contact the participant, the participant was not eligible, or the participant was no longer interested in the BIH Program. *See* (*id*). It does not contain language requesting that a possible participant provide information about their race, nationality, or ethnic identity. *See* (*id.*). Dr. Nguyen attests that, although the Program is focused on addressing the disparities in Black infant mortality, she is "not aware of any specific individuals who have been excluded from the program or BIH services on the basis of race." (Nguyen Decl. ¶ 45). She also represents that "CDPH does not take any actions to enforce any policies that might be interpreted to suggest that local BIH sites should disallow individuals from entering the program, or require individuals to be disenrolled from the program, based on racial criteria." (*Id.* ¶ 46).

In fact, based on "linked data with the California Birth Statistical Master File, . . . some past participants reported racial classifications on their California birth records that did not include any reference to Black, but instead identified as: White, American Indian, or another racial category." (*Id.* ¶ 50). Further, "[b]eginning in late 2024, the BIH Program began collecting self-identified race ethnicity data from participants after they had already been admitted to the program. These data also show that some participants did not identify as Black, but rather as Hispanic, Asian, White, American Indian or Alaska Native, and Middle Eastern or North African." (*Id.*).

4. <u>Implementation of the BIH Program at the Local Level</u>

The CDPH/MCAH implements the BIH Program in county and city Local Health Jurisdictions in California. (*Id.* ¶ 42). The County of Los Angeles contracts with the City of Pasadena, along with other County Contractors, to provide BIH Program services, though the County does not itself administer such services. (Franklin Decl. ¶ 43); (ECF No. 26-3 ("Scott Decl.") ¶ 3) (declaration of McKenzie Scott). "The BIH Program is one

of many services offered in Los Angeles County to expecting or new mothers and their infants." (Franklin Decl. ¶ 49).

Each year, the County applies for use of its state funding allocation for the BIH Program and must demonstrate there is both (1) a need for the BIH Program, and (2) target populations in the County that will be served by the Program. (*Id.* ¶¶ 44–45). The Program is not available in all parts of the County, as it only applies to target areas specifically selected because the area and populations show greater disparities in health and mortality outcomes between Black mothers/infants and those of other races. (*Id.* ¶ 45).

According to McKenzie Scott, who is a Community Services Representative II, serving as a Community Outreach Liaison for PPHD, the PPHD generally receives referrals from CDPH and, after receiving a referral, she and other PPHD staff will contact the potential participant and discuss the BIH Program and other available programs for individuals seeking pregnancy or parenting support. (Scott Decl. ¶¶ 3, 4, 8). Ms. Scott attests that, "once an applicant is ready to enroll in BIH, the applicant will meet with PPHD's Mental Health Specialist ("MHS"), who collects pertinent information and completes initial health assessments." (*Id.* ¶ 10). Ms. Scott represents that she has not experienced and has "no knowledge that [PPHD has] ever rejected an application for admission to the BIH program on the basis of the race of an otherwise qualified person interested in participating in the program . . . PPHD does not reject anyone from the BIH Program." (*Id.* ¶ 11).

**C. Plaintiff's Contact with the Pasadena BIH Program**

1. <u>Plaintiff's Completion of an Online Form</u>

Plaintiff resides in Pasadena, California. (ECF No. 13-5 ("Jimenez Decl.") ¶ 2). On or about February 23, 2026, Plaintiff "completed the interest/eligibility form located on the Pasadena Public Health Department" website, Black Infant Health program webpage.[3] (*Id.*

[3] Plaintiff did not attach a copy of the completed or blank form to the Complaint or her declaration in support of the Motion. Instead, the Memo references a hyperlink to the Pasadena Public Health Department website, Black Infant Health program webpage, which

¶ 3); (ECF No. 13-6 ("Memo") at 10–11) (Plaintiff's memorandum in support of the Motion). The website provides a description and historic overview of the BIH Program and contains tab links to, among other topics, "Program Services," "Resources & Links," "Intervention," "Health Disparities," and the "Interest/Eligibility Form." The Interest/Eligibility Form tab links to a blank online form that contains text boxes asking the user to input the user's name, date of birth, primary phone number, and zip code, as well as to click on "yes" or "no" boxes beneath questions asking: (1) "Are you currently pregnant?"; (2) "First time mom?"; and (3) "Do you or the baby identify as Black/African American?"[4] (Memo at 10–11) (citing *Black Infant Health Program*, Pasadena Pub. Health Dep't, https://www.cityofpasadena.net/public-health/black-infant-health-program/#interest-eligibility-form (last visited Aug. 28, 2026) ("PPHD Interest/Eligibility Form")). Neither the online form nor BIH Program webpage expressly states that the BIH Program is limited to only Black or African American women and infants or that the BIH Program prohibits non-Black or non-African American women and infants from participating in the BIH Program.

Plaintiff attests that she completed the form. (Jimenez Decl. ¶ 3). However, Plaintiff does not represent whether she checked "yes" or "no" to the question on the online form "Do you or the baby identify as Black or African American?" *See* (Compl. ¶ 29); (Memo at 10–11); (Jimenez Decl. ¶ 3). Plaintiff represents in her declaration that neither she nor her husband, who is the father of her child, self-identify as Black or African American.

---

contains a tab that, when clicked, links to a blank "Interest/Eligibility Form." *See* (Memo at 10). Plaintiff has requested the Court take judicial notice of the Pasadena website, which the Court has granted and reviewed for content. (*Id.* at 8 n.1). Although the Court has cited to portions of the historical overview provided on the website, which coincides with other material provided by the parties, and notes the content generally available on the website at the time Plaintiff accessed the PPHD BIH Program webpage, the Court otherwise has not judicially noticed the truth of all matters asserted on the website.

[4] The form indicates that the questions regarding the user's date of birth, primary phone number, zip code, and answers to the checkbox questions are mandatory. PPHD Interest/Eligibility Form.

(Jimenez Decl. ¶ 2). The Court thus assumes for purposes of the Motion that Plaintiff answered "no" to the question.

2. PPHD BIH Program Staff's Conversation with Plaintiff

Ms. Scott attests that on February 23, 2026, she received an email copy of Plaintiff's PPHD Interest/Eligibility Form. (Scott Decl. ¶ 4). Ms. Scott placed a telephone call to Plaintiff the same day, but did not reach her. (*Id.*). On February 27, 2026, Ms. Scott again called Plaintiff and, this time, spoke with her. (*Id.* ¶ 6); (Compl. ¶ 30). During the telephone call, Ms. Scott advised Plaintiff that Ms. Scott "worked with the Black Infant Health program and explained that the program supports/empowers pregnant and postpartum mothers that self-identify as African American or Black." (Scott Decl. ¶ 6). Scott also informed Plaintiff of additional available resources "as [she does] for anyone seeking pregnancy/parenting support, including those interested in the BIH program." (*Id.* ¶¶ 7–8). According to Ms. Scott, "[a]t no time during the call did [she] tell Ms. Jimenez she was being denied admission to, or not eligible for, the BIH program, nor did [she] ask her to identify her race during this conversation." (*Id.* ¶ 9). During the call, Ms. Scott provided Plaintiff with "information about her various options," which "did not concern any application by her for admission to the BIH, or any evaluation of her eligibility for same." (*Id.*). Ms. Scott attests, "it is neither part of my training nor my practice to inform those interested in the BIH program (or any other program) over the telephone that they are not eligible to participate." (*Id.* ¶ 10).

Plaintiff, on the other hand, attests on February 27, 2026, she spoke with an individual named "McKenzie," who she understood to be a program coordinator Pasadena's BIH Program. (Jimenez Decl. ¶ 4). Plaintiff states, "when I informed [McKenzie] that I am not black or African American or that my child is not Black or African American, McKenzie indicated to me that the program is not for me and informed me of other resources." (*Id.*).

3. Plaintiff's Subsequent Action After the Telephone Call with BIH Program Staff

After her February 27, 2026, telephone call with Ms. Scott, Plaintiff did not affirm her continued interest in the BIH Program or otherwise take any action to pursue participation in the BIH Program besides filing this lawsuit. In particular, Plaintiff did not contact PPHD at any time after their February 27, 2026, telephone call to indicate her desire to move forward with admission to the BIH program or to explore any of the other prenatal and infant resources and programs they discussed. (Scott Decl. ¶ 12). The record does not contain any evidence that Plaintiff received a rejection letter or other official notice that she has been denied entry to the BIH Program. Nor does the record contain any evidence that Plaintiff has applied to any other maternal and infant health program offered by the City of Pasadena, County of Los Angeles, or State of California.

## II. PROCEDURAL HISTORY

On April 2, 2026, Plaintiff filed the Complaint on behalf of herself and a putative class of similarly situated individuals, requesting, among other relief, an order enjoining Defendants from "excluding from the BIH program otherwise eligible persons on the basis of race" and a declaratory judgment that the Program violates the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. *See* (Memo at 7); *see also* (Compl.). On April 13, 2026, Plaintiff filed the present Motion and accompanying Memo, requesting the Court enjoin Defendants from excluding her from applying to and participating in the Program because of her race, and precluding the Program's use of race in the eligibility criteria, in violation of the Equal Protection Clause and Title VI. (Mot.); (Memo).

On May 6, 2026, County Defendants Barbara Ferrer and Los Angeles County Department of Public Health filed an Opposition to the Motion, (ECF No. 24 ("County Opp.")), and the same day Defendant Erica Pan separately filed an Opposition, (ECF No. 26). Defendant Pan filed a Corrected Opposition on May 7, 2026. (ECF No. 28 ("State Opp.")). Pasadena Defendants Manuel Carmona and Pasadena Department of Public

Health joined both the County Opposition, (ECF No. 25), and the State Opposition, (ECF No. 27). Plaintiff filed a "Combined Reply to Defendants' Oppositions" in support of the Motion on May 13, 2026. (ECF No. 31 ("Reply")). The Court subsequently held a hearing on the Motion and took the matter under submission. (ECF No. 34); (ECF No. 36 ("Transcript")).[5]

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until entry of a final judgment on the merits. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). A court may issue a preliminary injunction only if the plaintiff establishes "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 20). Of the factors, the likelihood of success on the merits, is "the most important factor" in determining whether preliminary relief is warranted. *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1230 (9th Cir. 2025).

In addition, the Ninth Circuit has adopted a version of a sliding scale approach for issuance of preliminary injunctions, where "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies*, 632 F.3d at 1135 (internal quotation marks and citation omitted). "In each case, courts

[5] On August 24, 2026, County Defendants and Defendant Pan each filed a Motion to Dismiss for Lack of Jurisdiction. (ECF No. 39 ("County MTD")); (ECF No. 40 ("State MTD")). Also on August 24, 2026, Pasadena Defendants joined both the County MTD, (ECF No. 41), and the State MTD, (ECF No. 42).

'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

Where, however, a plaintiff seeks mandatory relief by requesting that the court order the responsible party to take action before final judgment, the plaintiff must meet the "doubly demanding" burden and "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Because a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite*," it "is particularly disfavored," and the "district court should deny such relief unless the facts and law clearly favor the moving party." *Id.* (internal quotation marks and citations omitted); *see also Doe v. Snyder*, 28 F.4th 103, 111, 115 (9th Cir. 2022) (stating "[t]he standard for issuing a mandatory preliminary injunction is high" and will not issue "unless extreme or very serious damage will otherwise result").

On a motion for preliminary injunction, the court is permitted to consider the parties' pleadings, as well as declarations, affidavits, and exhibits submitted in support of and in opposition to the motion. *See K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) ("A verified complaint or supporting affidavits may afford the basis for a preliminary injunction."); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20 (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction). "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citations omitted). The urgency of the relief sought can make it difficult to obtain admissible evidence. *Id.* While it is within the purview of the district court to render credibility determinations before deciding a motion for preliminary injunction, it is not bound to do so. *Porretti v. Dzurenda*, 11 F.4th 1037, 1051 (9th Cir. 2021); *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) ("In deciding a motion for a preliminary injunction, the district court is not bound to decide doubtful and difficult questions of law

or disputed questions of fact.") (internal quotation marks and citation omitted). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

## IV. DISCUSSION

Plaintiff's Motion argues that she satisfies the *Winter* factors, warranting issuance of a preliminary injunction. *See* (Memo). Plaintiff contends she is likely to succeed on the merits of her Equal Protection and Title VI claims because the BIH Program fails strict scrutiny and is not narrowly tailored to meet a compelling interest, she will suffer irreparable harm absent preliminary injunctive relief because the Program serves pregnant women and mothers up to six months postpartum and she will soon become ineligible, and the balance of the equities weigh in her favor.[6] *See* (*id.*).

Defendants oppose the Motion, arguing that Plaintiff lacks standing and has failed to satisfy her burden of establishing a mandatory injunction is warranted. *See* (County Opp.); (State Opp.). County Defendants also argue that the Program survives strict scrutiny. *See* (County Opp. at 20–25). Defendant Pan argues that strict scrutiny does not apply to the Program but, if it did, the Program survives strict scrutiny. *See* (State Opp. at 20–28).

---

[6] In the Proposed Order Plaintiff filed with the Motion, Plaintiff requests the Court order that, "while this case is pending, Defendants shall not implement the race based racial eligibility criterion for applying to and participating in the Black Infant Health Program." (ECF No. 13-7 at 1). In Plaintiff's Memo, however, Plaintiff requests relief so that she may "apply to and participate in [the Program] before she reaches six months postpartum and is ineligible for the program services." (Memo at 19). Additionally, during the hearing on the Motion, Plaintiff requested that the Court order Defendants to "admit her to the [P]rogram and allow her to participate in the [P]rogram without regard to her race." (Transcript at 6). The Court, therefore, construes the Motion as an as-applied Equal Protection challenge to the Program, instead of based on a facial challenge. Plaintiff must therefore establish the law and facts clearly favor her position that the BIH Program, as applied to her, violates the Equal Protection Clause.

**A. Nature of Requested Injunction**

As an initial matter, the Court must determine the nature of the injunction Plaintiff requests, as the parties' filings in support of and in opposition to the Motion dispute the nature of the requested injunction and rely on different legal standards. In particular, the arguments in both Plaintiff's and the County Defendants' briefs presume that Plaintiff is seeking a prohibitory injunction. *See* (Memo at 11); (County Opp. at 18). Plaintiff's arguments are therefore based solely on the *Winter* factors relating to a likelihood of success on the merits. *See* (Memo at 11–17). The County Defendants similarly argue, based on the Ninth Circuit's "Sliding Scale Approach," that Plaintiff must show "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." (County Opp. at 18) (quoting *All for the Wild Rockies*, 632 F.3d at 1135). Defendant Pan, however, argues that, "[i]n this case, because Plaintiff's proposed injunction constitutes a mandatory injunction, she has a 'doubly demanding' burden to establish that the law and facts 'clearly favor' her position." (State Opp. at 16) (quoting *Garcia*, 786 F.3d at 740). Finally, the Pasadena Defendants have joined both oppositions without addressing the applicable legal standard.

Given the type of prospective relief Plaintiff seeks, the Court construes Plaintiff's Motion as requesting a mandatory injunction. As stated previously, "[a] mandatory injunction orders a responsible party to take action," that "goes well beyond maintaining the status quo pendente lite." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citing first *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996), then citing *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (internal quotation marks omitted)). In comparison, a prohibitory injunction "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Id.* (internal quotation marks and citation omitted); *see also Hernandez v. Sessions*, 872 F.3d 976, 998–99 (9th Cir. 2017) (recognizing that an injunction barring enforcement of a likely unconstitutional new law or policy is a "classic form of prohibitory injunction") (citing cases). The "status quo refers to the legally relevant relationship

between the parties before the controversy arose." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (internal quotation marks and citation omitted).

During the hearing on the Motion, Plaintiff's counsel initially argued that Plaintiff seeks a prohibitory injunction because Plaintiff seeks to "maintain the status quo of constitutionality" and was "not asking [Defendants] to do anything extra beyond complying with the Equal Protection Clause." (Transcript at 5–6). Plaintiff's briefing on the Motion, however, requests the Court issue and order enjoining "Defendants from keeping her out of the program before this Court can decide the merits of her claims" and, instead, allowing her to apply and participate in the Program before she reaches six months postpartum and becomes ineligible for the program services. *See* (Memo at 7, 19); (Reply at 17). Plaintiff's counsel also subsequently confirmed during the hearing that the injunctive relief Plaintiff is requesting is a court order compelling Defendants "to admit her to the program and allow her to participate in the program without regard to her race," as well ordering Defendants to enact different eligibility criteria. (Transcript at 5–6); (Memo at 19). Therefore, as Plaintiff seeks relief beyond maintenance of the status quo, Plaintiff requests a mandatory injunction. *See, e.g.*, *Snyder*, 28 F.4th at 111 (affirming district court's holding that minors sought a mandatory injunction where minors requested an injunction on behalf of themselves and others similarly situated compelling Arizona's Medicaid program to change its policy).

To obtain the mandatory relief that she seeks, Plaintiff must therefore establish that "the law and facts *clearly favor* her position." *See Garcia*, 786 F.3d at 740; *see also Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (mandatory injunctions are "particularly disfavored" and "not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages") (internal quotation marks and citation omitted).

**B. Standing**

Having determined that Plaintiff seeks a mandatory injunction, the Court must next determine whether Plaintiff has established Article III standing to obtain the prospective

relief that she seeks. The party invoking federal jurisdiction bears the burden to establish three elements for standing that are the "irreducible minimum required" by Article III of the Constitution. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("*General Contractors*")); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see Warth v. Seldin*, 422 U.S. 490, 498 (1975) (standing is "threshold question in every federal case, determining the power of the court to entertain the suit"). For a plaintiff to sue in federal court and obtain a judicial determination of a dispute, the plaintiff "must have a personal stake in the dispute." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (internal quotation marks omitted). "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982)).

To establish standing, a plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). An "injury in fact" must be concrete, particularized to the plaintiff, and actual or imminent. *Lujan*, 504 U.S. at 560. To be "concrete," the injury "must be real and not abstract." *All. for Hippocratic Med.*, 602 U.S. at 381. To be "particularized," 'the injury must affect the plaintiff in a personal and individual way and not be a generalized grievance. *Id.* (internal quotation marks omitted). "Moreover, the injury must be actual or imminent, not speculative—meaning the injury must have already occurred or be likely to occur soon." *Id.*; *see Heckler v. Mathews*, 465 U.S. 728, 738 (1984) ("[A] plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.") (internal quotation marks and citation omitted). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiff who might have only a general legal, moral, ideological, or

policy objection to a particular government action." *All. for Hippocratic Med.*, 602 U.S. at 381. Standing to challenge a government regulation does not arise "simply because the plaintiff believes that the government is acting illegally" or because the plaintiff's "legal objection is accompanied by a strong moral, ideological, or policy objection to a government action." *Id.*

"At the preliminary injunction stage, [ ] the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). The court, in determining whether a plaintiff has met the burden of demonstrating Article III standing, may consider the complaint, declarations, and other evidence the parties have submitted on the issue. *See California Trucking Ass'n v. Bonta*, 996 F.3d 644, 652–53 (9th Cir. 2021); *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956–57 (9th Cir. 2021).

1. Injury in Fact

Defendants argue that Plaintiff has failed to establish that she has suffered an injury in fact because Defendants did not prohibit Plaintiff from applying to or participating in the BIH Program. (County Opp. at 19); (State Opp. at 17–19). Defendants also contend that Plaintiff did not actually apply to the Program despite the opportunity to do so, and Plaintiff has not pointed to facts demonstrating she remains able and ready to participate in the Program. (County Opp. at 19); (State Opp. at 17–19).

Plaintiff's Motion did not address her standing to bring suit. In her Reply, however, she asserts that she suffered an injury when she initially "submitted her interest form to Pasadena's program." (Reply at 7–8). While Plaintiff acknowledges "there may be several *more* steps beyond the public-facing first step" of completing the PPHD Interest/Eligibility Form, Plaintiff argues "those further steps do not negate [her] demonstrated interest and subsequent action," and that because it is the Program's "imposition of the [racial] barrier" that caused her injury, she did not have to actually apply to the Program. (*Id.*).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *City of*

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, § 1). The Equal Protection Clause essentially directs "that all persons similarly situated should be treated alike." *Id.* Thus, the Supreme Court has held in its "broader equal protection jurisprudence," that "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 309–10 (2013).

Because the BIH Program amounts to an official action, whose title and intervention goals take race and ethnicity into account, the Court will look to some Supreme Court's decisions in the racial classification context, which help to provide a legal framework for the Court's analysis of standing.[7]

In *Warth v. Seldin*, individuals and organizations in a metropolitan area sued an adjacent town and its zoning board, alleging that the town's zoning ordinance and the zoning board's acts violated the Fourteenth and other Amendments. 422 U.S. at 493. The plaintiff-petitioners alleged that the terms of the defendant town's zoning ordinance had the effect of excluding low-income groups from living in the town because the ordinance allocated 98% of vacant land to the construction of single-family homes and only .3% to multi-family structures, and the defendant town's zoning board engaged in discriminatory actions by delaying and denying permits for low-income housing and refusing to grant permits and variances. *Id.* at 495–96. An association of contractors sought to intervene in

---

[7] The Court considers these types of cases even though the circumstances presented may not be a precise fit. Plaintiff has not provided any evidence that the BIH Program reserved a specific number or percentage of spots in the Program for applicants based on race or that the Program requires applicants to "compete" with each other for a limited number of spots in the Program, as is typically the factual circumstance in the Supreme Court's set-aside and affirmative action cases. Also, because a discrimination claim under Title VI is similar to an equal protection claim under the Fourteenth Amendment, *see Grutter v. Bollinger*, 539 U.S. 306, 343 (2003); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.)) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment."), the Court's standing analysis is equally applicable to Plaintiff's Title VI claim.

the suit and join in the petitioners' prayer for injunctive relief, arguing that the board's exclusionary practices, together with the board's refusal to grant variances for the construction of low-income housing, prevented the association's members from building low-income housing in the town and realizing profits. *Id.* at 514–16. The Supreme Court held that the intervenor-association could not establish an injury for purposes of standing because its complaint did not refer to any specific project of its members that was currently being precluded by the ordinance or board's actions in enforcing it. The intervenor-association's complaint also did not include an allegation that any member had applied for a permit or variance for a current project, or that the board had delayed or thwarted any current project, or that any member had availed itself of the available variance process. *Id.* at 516. In short, the intervenor-association's complaint failed to demonstrate "the existence of any injury to its members" to warrant judicial intervention in the form of prospective relief. *Id.*

In *Gratz v. Bollinger*, the Supreme Court ruled that a Caucasian applicant for admission to the University of Michigan, College of Literature, Science, and the Arts, had standing to bring an equal protection challenge seeking prospective relief to the university's use of race in its undergraduate admissions. 539 U.S. 244, 249–51 (2003). The Court noted that "intent may be relevant to standing in an equal protection challenge." *Id.* at 261. Further, it pointed out that the petitioner-applicant had alleged that the University had already denied him the opportunity to compete on an equal basis for admission because, when he "applied to the University as a freshman applicant, he was denied admission even though an underrepresented minority applicant with his qualifications would have been admitted." *Id*. at 262. The Court also credited the findings of the district court that the petitioner intended to again apply as a transfer student. *Id*. The Supreme Court thus concluded the petitioner had "demonstrated he was 'able and ready' to apply as a transfer student should the university cease to use race in undergraduate admissions." *Id.*; *see Bakke*, 438 U.S. at 280 n.14 (holding that a white, male applicant, whose admission to medical school had been rejected twice, had standing to bring an equal

protection challenge to the school's admission program, which reserved 16 of the 100 spots in the entering class for disadvantaged minority applicants, because he was injured by the school's "decision not permit [him] to compete for all 100 places in the class, simply because of his race.").

Similarly, in *General Contractors*, the Supreme Court recognized that a plaintiff-association asserted an injury when its members were unable to equally bid for contracts under a local city ordinance. 508 U.S. at 666. The ordinance required 10% of the amount spent on city contracts to be set aside for "Minority Business Enterprises," defined as business that were majority owned by female individuals or certain racial minorities. *Id.* at 660–61. The members of the plaintiff-association largely did not qualify as "Minority Business Enterprises," and challenged the ordinance on equal protection grounds. *Id.* at 666. In its complaint, the association alleged that many of its members regularly bid on and performed work for the city and "would have . . . bid on . . . designated set aside contracts but for the restrictions imposed." *Id.* at 659 (quoting the association's complaint). As the association's representation was not challenged with contrary evidence, the Supreme Court noted that it "must assume that [the allegations] are true." *Id.* at 668–69. In its opinion, the Supreme Court recognized that the association's members did not have to demonstrate that, but for the set-aside barrier erected by the government, they would have been awarded a contract. *Id.* at 666. Instead, the Court held that "[t]he 'injury of fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier. . . ." *Id.* "To establish standing, therefore, a party challenging a set-aside program . . . need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.*

With the above legal framework in mind, the Court concludes Plaintiff has not met her burden to clearly show that the BIH Program's policies, as applied to her, impose a barrier preventing her from applying to and participating in the BIH Program. Nor has she shown that she is able and ready to enroll in and participate in the Program.

2. <u>Claimed Barrier</u>

In her Reply,[8] Plaintiff points to four aspects of the Program that she claims imposes a barrier: (1) the Defendants' public-facing description of the BIH Program; (2) the racial identification question on the PPHD Interest/Eligibility Form; (3) the BIH Program's policy and practice of discussing other alternative prenatal programs; and (4) the existence of the BIH Program's exception procedure. *See* (Reply at 7–10). As Plaintiff is challenging the BIH Program's policies and procedures as-applied to her and is seeking mandatory injunctive relief, the Court must necessarily consider the specific facts presented by Plaintiff as framed in her declaration. *See City of Cleburne, Tex.*, 473 U.S. at 447 (endorsing and adopting the individualized consideration of facts presented by an as-applied challenge under the Equal Protection Clause, stating that such an approach is the "preferred course of adjudication since it enables court to avoid making unnecessarily broad constitutional judgments"). From the Court's review of the facts in the record, Plaintiff has not provided factual support for her arguments that she suffered an actual, concrete, and particularized injury from any of these aspects of the BIH Program.

First, citing to *Brewster v. City of Los Angeles*, Plaintiff contends that, because "every public-facing description of the program communicates that eligibility is conditioned on race, Defendants' description told the public and putative class that access to the BIH Program is unequal. *See* (Reply at 9) (citing 672 F. Supp. 3d 872, 971 (C.D.

---

[8] Because Plaintiff made her standing argument for the first time in her Reply, the Defendants were deprived of an opportunity to respond to them point-by-point, but their standing arguments generally address those raised by Plaintiff. Further, because standing cannot be waived and the Court has a duty to determine its own jurisdiction, each of Plaintiff's arguments has also been considered by the Court. *See United States v. Hays*, 515 U.S. 737, 742–43 (1995); *see also Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 547 (1986) (The question of standing is a "'question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.'") (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

Cal. 2023)) (arguing that the BIH Program describes its benefits as being "limited" to pregnant Black/African American women and infants); *see also* (Memo at 7, 8, 10) (asserting the BIH Program "only permits black or African American mothers to participate," "offers services exclusively to pregnant and postpartum mothers . . . who racially identify as black, and that "[e]ligibility for Pasadena's BIH is limited to individuals who . . . identify as black or African American"); (Compl. ¶¶ 21–22). Defendants, however, argue that Plaintiff has not presented evidence that she would have been rejected from the BIH Program based on her race if she had actually sought to enroll. *See* (State Opp. at 18); (County Opp. at 19).

Despite Plaintiff's characterization throughout her briefing of the BIH Program being "limited" and "exclusive," Plaintiff has not pointed the Court to any language in Defendants' description of the BIH Program at the State, County, or City level that expressly prohibits non-Black pregnant and post-partum mothers from applying to and participating in the Program. To the contrary, as Plaintiff acknowledges, CDPH's "Local MCAH Program Policies and Procedures" manual, which includes policies and procedures regarding the BIH Program, contains an expressed Discrimination Prohibition that points out, "Title V prohibits exclusion from participation, denial of benefits, or discrimination in any program or activity funded in whole or in part with Title V monies based on race, color or national origin. . . ." *See* (Memo at 17); (ECF No. 13-4, Ex. C at 13) (Local MCAH Programs Policies and Procedures manual).

Additionally, to satisfy her burden of demonstrating a personal injury, Plaintiff has not provided any evidence in support of her Motion establishing that Defendant's public-facing description of the BIH Program imposed a barrier preventing her in particular from applying to and participating in the Program. The Court notes that Plaintiff's Declaration does not describe at all how she learned of or arrived at the BIH Program webpage on the PPHD website. *See* (Jimenez Decl.). Additionally, while the BIH Program webpage contains a description of the Program's history, purpose, Program features, and goals, Plaintiff does not state what, if any, content she reviewed on the webpage or elsewhere

before completing the PPHD Interest/Eligibility Form. Nor does Plaintiff state in her declaration that any of the content on the PPHD BIH Program webpage discouraged her from clicking on the tab to obtain a PPHD Interest/Eligibility Form. To the contrary, the evidence in the record demonstrates that, regardless of the descriptions Defendants provided to the public about the BIH Program's history, purpose, Program features, and goals, Plaintiff completed the PPHD Interest/Eligibility Form and submitted it without any factual statement in the record that such public descriptions imposed any barrier to her expressing an interest. *See* (Jimenez Decl. ¶ 3); (Scott Decl. ¶¶ 4–6). Thus, the Court finds Plaintiff has not shown that Defendants' public-facing descriptions of the BIH Program prevented Plaintiff personally from applying for and participating in the Program. *See Warth*, 422 U.S. at 502 (That the petitioners have attributes in common with persons who may have been excluded due to the challenged ordinance and board's discriminatory actions "is an insufficient predicate for the conclusion that petitioners themselves have been excluded. . . . Petitioners must allege and show that they personally have been injured, not that an injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.").

Second, Plaintiff has not shown that the PPHD's racial identification question on the PPHD Interest/Eligibility Form, which is asked of all those who complete the form, or even her response thereto, imposed a barrier that prevented Plaintiff from obtaining the Program's benefits. Although Plaintiff argues that she "suffered [an] injury when she submitted her interest form to Pasadena's program," *see* (Reply at 7), her declaration does not state that she was dissuaded from completing the PPHD Interest/Eligibility Form by the question on the form asking, "Do you or your baby identify as Black or African American?" *See* PPHD Interest/Eligibility Form. Nor does Plaintiff attest in her declaration that she felt compelled to respond to the question, despite the Reply making this factually unsupported argument. Indeed, Plaintiff does talk about the racial identity question on the PPHD Interest/Eligibility Form at all in her declaration. *See* (Jimenez Decl.). And despite Plaintiff presumably answering "no" to the racial identification

question, a BIH Program staff member telephoned Plaintiff shortly thereafter to provide Plaintiff with information about the Program's features, as well as other programs offered by Defendants. *See* (Scott Decl. ¶ 4). Based on these facts, the Court finds that Plaintiff has failed to establish that the racial identification question imposed a barrier preventing Plaintiff from applying to and participating in the BIH Program. *See Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 659 (9th Cir. 2002) (the conclusion that the school district's practice of monitoring the racial and gender composition of the student applicant pools for three schools, "standing alone, prevent[ed] the plaintiffs from applying to" the schools "on an equal basis (even though all applicants were subjected to the same monitoring practices) places an unnecessary and impractical strain on the Article III standing requirement that the plaintiff show a concrete and particularized injury.").

Third, the only aspect of the BIH Program that Plaintiff points to in her declaration as imposing a barrier on her is surmised in the following sentence, "[w]hen I informed [Ms. Scott] that I am not black or African American or that my child is not black or African American, McKenzie indicated to me that the program is not for me and informed me of other resources." (Jimenez Decl. ¶ 4). Plaintiff, however, does not provide any factual details or identify the specific statement(s) made by Ms. Scott that purportedly "indicated" to Plaintiff that the BIH Program was not for her. However, during the hearing on the Motion, Plaintiff's counsel argued that it was Ms. Scott's discussion of available alternatives to the BIH Program that dissuaded Plaintiff from moving forward with enrollment. *See* (Transcript at 11–12) (arguing the BIH Program's "practice and a policy" of discussing and providing alternatives "is enough of a rejection or is enough to indicate that this is a program that's not for an applicant based on race"). Yet, Ms. Scott attests that informing Plaintiff of additional available resources is part of her practice, as she does "for anyone seeking pregnancy/parenting support, including those interested in the BIH program." (Scott Decl. ¶¶ 7–8). Plaintiff has therefore not established that being informed of such alternatives caused her to suffer particularized, concrete injury.

Further, to the extent Plaintiff's uses the word "indicated" to suggest that Ms. Scott affirmatively or expressly told Plaintiff that she was prohibited from enrolling in the BIH Program due to her race or ethnicity, Plaintiff's vague assertion is contradicted by Ms. Scott's account of the conversation. *See* (Jimenez Decl. ¶ 4). Ms. Scott attests, "[a]t no time during the call did I tell Ms. Jimenez she was being denied admission to, or not eligible for, the BIH program, nor did I ask her to identify her race during this conversation." (*Id.* ¶ 9). Thus, there is also a factual dispute as to the statements that were made during Plaintiff's conversation with Ms. Scott. *See* (State Opp. at 18). In deciding whether Plaintiff has made a clear showing that she is entitled to the requested relief, the Court is not inclined to resolve that factual dispute or make credibility determinations on this limited record and at this stage of the proceedings. *See Int'l Molders' & Allied Workers' Loc. Union No. 164*, 799 F.2d at 551. Nevertheless, Plaintiff's vague assertions are insufficient to satisfy her burden of establishing that Ms. Scott's mere discussion of alternative programs prevented her from applying to and participating in the BIH Program.[9]

Fourth, Plaintiff argues that "the very existence of a discretionary 'exception procedure' for applicants who do not belong to the program's favored racial group confirms that race operates as a barrier to equal access." (Reply at 8–9). Plaintiff also acknowledges, however, that because she was not aware of the exception procedure, its existence is irrelevant to the Court's injury analysis. *See* (*id.* at 7) (arguing that Defendant's assertions that Plaintiff did not avail herself of the exception procedure "of which no one but Defendant is aware" is not relevant to her injury of unequal access). More importantly, Plaintiff never applied to the BIH Program and was never actually denied its services and

---

[9] Relatedly, Plaintiff also has not demonstrated that Ms. Scott's description of the BIH Program during their February 27, 2026, telephone call served as a barrier preventing Plaintiff from competing on equal footing for Program benefits. Ms. Scott attests that she described the BIH Program and "explained that, as part of the BIH program, there are group sessions with other women who are Black or identify their baby as Black." (Scott Decl. ¶ 6). Plaintiff's declaration, however, does not assert that this description was the catalyst preventing Plaintiff from going forward with enrolling in the BIH Program.

therefore never needed to avail herself of any exception procedures. (State Opp. at 19). Additionally, as pointed out by the County Defendants, Plaintiff has not stated "that she wants to participate in the program or explain[ed] how she might benefit from it." (County Opp. at 17). On these facts, Plaintiff has failed to show that the mere existence of an exception procedure is evidence of a barrier that prevented Plaintiff from enrolling in and participating in the Program. *See Scott*, 306 F.3d at 657 (the existence of a racial barrier, without a showing that a plaintiff "has been, or is genuinely threatened with the likelihood of being, subjected to such a barrier," is insufficient to establish standing).

Accordingly, Plaintiff has failed to satisfy her burden of establishing that any aspects of the BIH Program imposed a barrier to her enrollment and participation.

*a) Able and Ready*

Plaintiff also has not established she is able and ready to apply to the BIH Program. *See General Contractors*, 508 U.S. at 666. In the context of set-aside minority programs, the Supreme Court has held that, "[i]t is a plaintiff's ability and readiness to bid that ensures an injury-in-fact is concrete and particular . . . Entering a bid makes the injury actual; deciding not to bid makes the injury imminent." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020). However, a plaintiff need not "go through the futile motions of applying and inevitably being turned away." *Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1159 (9th Cir. 2024) (citing *Gratz*, 539 U.S. at 260–61).

In *Carney v. Adams*, the Supreme Court concluded that a plaintiff challenging a political balancing requirement for judges on Delaware courts did not suffer a cognizable injury because he did not demonstrate that he was "able and ready" to apply for a judgeship. 592 U.S. 53, 63–64 (2020). Based on the record presented for summary judgment, the plaintiff failed to show that he would apply for a judgeship "in the reasonably foreseeable future." *Id.* Instead, the record suggested that the plaintiff had an "abstract, generalized grievance" to the political balancing requirement, not that he wanted to become a judge, and the plaintiff only provided a "few words of general intent" regarding his interest. *Id.*

Though the Court did not decide "whether a statement of intent alone under other circumstances could be enough to show standing," the Court reaffirmed that "injury in fact requires an intent that is concrete." *Id.* at 64. By failing to show that he was "able and ready" to apply for a judgeship, the plaintiff failed to demonstrate that he suffered a personal, concrete, and imminent injury. *Id.* at 66.

Applying the "able and ready" standard, the Ninth Circuit held in *Caroll v. Nakatani* that the plaintiff must take some affirmative step evidencing intent to apply to demonstrate an injury. 342 F.3d 934, 942–43 (9th Cir. 2003). There, the plaintiff alleged that a state program that allocated funds for a small business loan program operated by the Office of Hawaiian Affairs impermissibly classified individuals and provided small business loans based on their "Hawaiian" ancestry, and that his loan application was impermissibly denied because he stated that he was not of Hawaiian descent. *Id.* at 938–39, 941. The court held, however, that the plaintiff did not have standing to bring an equal protection challenge to the program because he was not "able and ready" to compete for the funds. *Id.* at 941–43. The court explained that the plaintiff filed an incomplete application, did not prepare a business plan for the loan, and his complaint predated his loan application. *Id*. In addition, when the Office of Hawaiian Affairs requested that the plaintiff return a completed application demonstrating his Hawaiian heritage, plaintiff failed to do so. *Id.* at 941. Based on these facts, the Ninth Circuit concluded that the plaintiff had not suffered an injury but instead filed an unactionable "generalized grievance" challenging the constitutionality of the Office of Hawaiian Affairs loan program. *Id.* at 943; *see also Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1185 (9th Cir. 2012) (concluding that a subcontractor plaintiff lacked standing to challenge an affirmative action contracting bid program because he "merely contacted" prime contractor bidding firms and "did not submit a quote or bid to any of the prime contractors bidding on the government contract.").

Similarly, here, the Court finds that Plaintiff has not clearly shown that she is able and ready to apply for the BIH Program. "Precedent supports the conclusion that an injury in fact requires an intent that is concrete." *Carney,* 592 U.S. at 502. To establish her intent,

Plaintiff states in her declaration, "[i]f my race and ethnicity and the race and ethnicity of my child were eligible, I would be ready and able to apply for the Black Infant Health Program." (Jimenez Decl. ¶ 6). Other than her barebones statement, which amounts to a legal conclusion, Plaintiff has not provided sufficient facts showing that she remains both able and ready to apply to the Program in the reasonably foreseeable future. *E.g.* (Compl. ¶¶ 28–34); *see, e.g.*, *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 955 n.9 (9th Cir. 2011) ("To sufficiently allege standing, [a plaintiff] must do more than offer 'labels and conclusions' that parrot the language of the [statute].") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Do No Harm v. Gianforte*, No. CV 24-24-H-BMM-KLD, 2025 WL 756742, at *6–*7 (D. Mont. Jan. 10, 2025), *report and recommendation adopted*, No. 6:24-cva-00024-BMM-KLD, 2025 WL 399753 (D. Mont. Feb. 5, 2025) (on a motion to dismiss, plaintiffs raising an equal protection challenge to allegedly discriminatory eligibility criteria "must allege facts demonstrating that the Members have a real interest in, and intend on, applying for a Board seat in the reasonably foreseeable future, such that they are differentiated 'from a general population of individuals affected in the abstract' by the challenged statute") (citing *Carney*, 592 U.S. at 64).

The facts in the record and Plaintiff's declaration support the inference that Plaintiff withdrew her interest in applying to the BIH Program after speaking with Ms. Scott, and Plaintiff has not attested to any facts thereafter establishing her continued interest in the BIH Program or that she took any action to enroll in the BIH Program or any other maternal health program before filing suit. On this record, Plaintiff's initial act of completing an "interest/eligibility form for the BIH Program" is insufficient to clearly show that she is currently able and ready to apply for and enroll in the BIH Program.[10] *See* (Jimenez Decl.

[10] During the hearing, Defendant Pan's counsel represented that the interest/eligibility form that Plaintiff states she completed was only to request the "original information call." (Transcript at 17). During this informational call, an individual like Ms. Scott would discuss various programs offered by CDPH and PPHD, including BIH. Defendants argue that to demonstrate she was "able and ready," Plaintiff would need to make "an expression . . . that [she] want[s] to be considered" for the Program, such as a verbal expression of

¶ 3). According to Ms. Scott, as part of the application process, "once an applicant is ready to enroll in [the Black Infant Health Program], the applicant will meet with PPHD's Mental Health Specialist ("MHS"), [who] collects pertinent information and completes initial health assessments." (Scott Decl. ¶ 10). These facts, coupled with Plaintiff's failure to include facts in her declaration establishing her continued interest in the Program, support Defendants' arguments that Plaintiff has only shown a general or initial interest in the Program but has not established that Plaintiff intends to apply to the BIH Program and is able and ready to do so in the near future. *See Carney*, 592 U.S. at 60 (a sincere and strong desire that state laws "should comply with the Federal Constitution . . . does not create standing" absent a concrete, particularized, and imminent injury).

Although generally a plaintiff need not "go through the futile motions of applying and inevitably being turned away," *Loffman*, 119 F.4th at 1159, *Carney* and *Carroll* counsel that a plaintiff challenging eligibility restrictions under the Equal Protection Clause must demonstrate a real intent to apply to the program through previous applications or actions taken in preparation for an application. *See Carney*, 592 U.S. at 63–64; *Carroll*, 342 F.3d at 942–43. Here, the Court finds on the present record Plaintiff's completion of the PPHD Interest/Eligibility Form is akin to the plaintiff contacting a contracting bidding firm without submitting a quote in *Braunstein* or the plaintiff submitting an incomplete application in *Carroll*—both of which the Ninth Circuit determined to be insufficient to establish that a plaintiff is "able and ready" to apply for the desired program. *See Braunstein*, 683 F.3d at 1185; *Carroll*, 342 F.3d at 943.

Additionally, unlike the cases cited by Plaintiff, where the Ninth Circuit concluded that it would have been futile for the plaintiffs to apply for an allegedly discriminatory government program, Plaintiff has not submitted evidence clearly showing it would have been futile for her to apply for the BIH Program. *See* (Reply at 8 n.1 (citing first *Desert*

---

"[y]es, that sounds good." (*Id.* at 17–18). After this verbal expression confirming interest in the Program, Plaintiff would "be connected with a mental health specialist who would do some evaluations" and "meet to discuss the [P]rogram." (*Id.*).

*Outdoor Advert., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996); then citing *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002), *as amended* (Sept. 25, 2002))). The PPHD Interest/Eligibility Form completed by Plaintiff did not state that she was prohibited from applying for the Program if she or her baby did not identify as Black or African American. *See* PPHD Interest/Eligibility Form. Nor does the evidence demonstrate that a "no" response to the race identification question on the PPHD website would have precluded Plaintiff from being referred to and being contacted by personnel from the BIH Program. *E.g.* (Nguyen Decl. ¶ 46); (Scott Decl. ¶ 11). In fact, after Plaintiff completed the form and presumably answered, "no" to the racial identification question, Ms. Scott contacted Plaintiff on behalf of the Program and discussed with Plaintiff various resources offered. Scott also attests "upon information and belief," that the PPHD has not affirmatively turned anyone away from or rejected anyone from the BIH program that has applied. (Scott Decl. ¶ 11). Additionally, Dr. Nguyen attests that "CDPH does not take any actions to enforce any policies that might be interpreted to suggest that local BIH sites should disallow individuals from entering the program, or require individuals to be disenrolled from the program, based on racial criteria." (Nguyen Decl. ¶ 46).

Based on the current record, the Court finds Defendants have provided evidence in support of their argument that Plaintiff has raised a generalized grievance against the Program, and not a specified injury. By comparison, Plaintiff has not supported her conclusory assertions that she is ready and able to apply for the Program with sufficient facts. *See, e.g.*, *Carroll*, 342 F.3d at 943 (holding the plaintiff's "declaration of 'interest' in starting a copy shop, and submission of a meritless application falls short of being "able and ready" to compete for a small business loan). The Court thus finds that Plaintiff has not clearly established an injury in fact to establish standing.

## V. CONCLUSION

For all the foregoing reasons, the Court DENIES the Motion.

**IT IS SO ORDERED.**

DATED: August 28, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE